UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 21 CR 536 |
| v. | ) | |
| | ) | |
| KAROL J. CHWIESIUK & | ) | Hon. Kollar-Kotelly |
| AGNIESZKA CHWIESIUK | ) | |

**DEFENDANTS' MOTION TO TRANSFER VENUE**

The defendants, Karol J. Chwiesiuk and Agnieszka Chwiesiuk, through their counsel, respectfully request that this Court transfer their trial to another district, or in the alternative, grant them expanded examination of prospective jurors. In support, the Chwiesiuks state:

**I. Background**

Karol J. Chwiesiuk and Agnieszka Chwiesiuk are charged in connection to the events occurring at the United States Capitol on January 6, 2021. Both defendants are charged with entering and remaining in a restricted building in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five). Dkt. 54. Karol J. Chwiesiuk is further charged with entering or remaining in a room designated for the use of a member of Congress in violation of 40 U.S.C. § 5104(e)(2)(C)(i) (Count Three). *Id.* Both defendants are residents of the State of Illinois and Mr. Chwiesiuk is a former police officer with the Chicago Police Department. The trial of this matter is scheduled for May 1, 2023.

**II. Argument**

    **A.   The Court Should Transfer the Proceeding to Another District**

The Sixth Amendment secures criminal defendants the right to trial "by an impartial jury." U.S. Const. amend. VI. That trial typically occurs in "the State and district wherein the crimes…

1

have been committed." *Id.* However, all criminal defendants also enjoy a constitutional right to due process. U.S. Const. amend V. Thus, the Sixth Amendment's "place-of-trial provision" does not "impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial – a 'basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (citing *In Re Murchison*, 349 U.S. 133, 136 (1955)). If such prejudice exists, the defendant may move to transfer the proceeding to another district. Fed. R. Crim. Pro. 21(a). When a defendant so moves, "the court must transfer the proceeding… if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Id.*

Ordinarily, adequate *voir dire* determines whether a fair and impartial jury can be seated. However, the Supreme Court has recognized that in an "extreme case," prejudice may be presumed from pretrial publicity. *Skilling*, 561 U.S. at 379-81 (collecting cases where pretrial publicity did support a presumption of prejudice). This presumption is appropriate in prominent cases where "media coverage manifestly taint[s] the criminal prosecution." *Id.* (citing *Estes v. Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell*, 384 U.S. 333 (1966)). However, because juror impartiality does not require ignorance of the facts and issues involved, mere juror exposure to news accounts of the crime is not itself sufficient to presume a due process violation. *Id.* at 381 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). In *Skilling*, the Court identified three factors for the lower courts to consider when determining whether a presumption of prejudice is warranted: (1) the "size and characteristics of the community in which the crime occurred;" (2) whether press coverage "contained blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" and (3) the time that elapsed between the relevant events and the trial. *Id.* at 382-83.

Here, the factors weigh in favor of a presumption of prejudice. For the reasons detailed below, the defendants request transfer to another district. If transfer is denied, the defendants request expanded *voir dire* to better identify prospective jurors who may hold a bias against them.

**(1) The Size and Characteristics of the Community**

The size and characteristics of the community is a factor supporting transfer to another district. The population over the age of 18 in the District of Columbia is approximately 545,500.[1] Residents of the District of Columbia are more tied to the federal government in that it is where the greatest number of federal employees live, including the employees of many of the agencies involved in the present case.[2] Further, the community of prospective jurors was more directly affected by January 6 than those of other jurisdictions because the events resulted in a brief citywide curfew, an emergency order lasting for 15 days, and increased police presence, including thousands of national guardsmen.[3] While not every resident of the District of Columbia would have been directly impacted by the events, the fact that the relevant community lives in the epicenter of American politics, coupled with the prevalence and nature of the press coverage, supports the defendants' motion for transfer.

Other defendants charged in connection to January 6 have raised similar claims which have been rejected, in part because the population of this community is larger than other communities where courts have previously presumed prejudice. *See e.g.*, *United States v. Garcia*, 21-CR-129, Dkt No. 83 at 15 (July 22, 2022); *United States v. Nassif*, No. 21-CR-421, Dkt. 42 at 17 (September 12, 2022). However, where the Court has found that pretrial publicity supported a presumption of prejudice,

---

[1] The total population estimate is 671,803 but removing the 18.8% that are under the age of 18 results in a total estimated population over the age of 18 of 545,504. Quickfacts: District of Columbia, U.S. Census Bureau (July 1, 2022), available online at: https://www.census.gov/quickfacts/fact/table/DC/PST045222#PST045222

[2] Darla Cameron, Dan Keating, & Armand Emamdjomeh, *Where do Federal Workers Live?,* Washington Post, (Aug. 30, 2018), available online at: https://www.washingtonpost.com/graphics/2018/politics/federal-workers/  A*lso see* Federal Workforce Data Comparison, OPM, (September 2022), available online at: https://www.fedscope.opm.gov/

[3] *See* Muriel Bowser, Mayor of the District of Columbia, Order 2021-003 (Jan. 6, 2021), available online at: https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1

3

the size of the relevant communities has varied significantly. In *Rideau v. Louisiana*, for example, the community involved had a population of only approximately 150,000. 373 U.S. 723, 724 (1963). However, in *Shepherd v. Maxwell*, the population of the community was over 1 million.[4] 384 U.S. 333 (1966). While the ruling in *Shepherd* was based on both pretrial publicity and the "carnival atmosphere," at trial, the Court nonetheless premised its holding on a presumption that the jurors were prejudiced by publicity, not on a finding of actual prejudice. *Id.* at 357 ("…this deluge of publicity reached at least some of the jury;"); *Id.* ("…we can assume that some of this material reached members of the jury.").

Similarly, in *Delaney v. United States*, the trial took place in Boston, Massachusetts, a community with a population of around 800,000 at the time.[5] 199 F.2d 107 (1st Cir. 1952). There, the First Circuit held that it was an error to deny the defendant's motion for a continuance of trial "until such time as it could be estimated with greater assurance that the prejudicial effect [of the publicity surrounding public hearings of a Committee of the House of Representatives] had so far worn off that the trial could proceed free of the enveloping hostile atmosphere and public preconception of guilt..." *Id.* at 112. The defendant had not moved for a transfer of venue, but the Court's analysis of whether the trial should have been continued did require it to consider whether the community was presumptively prejudiced by the media coverage. *Id.* at 113-14. The Court ultimately found that the pretrial publicity, which was national but "intensified in the Boston area," did support such a presumption, despite the jurors' *voir dire* responses to the contrary and despite the large population of the community. *Id.* at 111, 115. Thus, while the size of the community is certainly relevant, prior

---

[4] "Cuyahoga County total…1,378,205," Population of Ohio By Counties, 1950 Census of Population (April 1, 1950), available online at: https://www2.census.gov/library/publications/decennial/1950/pc-02/pc-2-41.pdf
[5] "Boston City total… 790,863," Population of Boston by Counties, 1950 Census of Population (April 1, 1950), available online at: https://www2.census.gov/library/publications/decennial/1950/pc-02/pc-2-28.pdf

rulings suggest that the larger population of the District of Columbia does not foreclose a finding that prejudice may be presumed.

Further, a presumption of prejudice is warranted because of the unprecedented nature of the events of January 6. In *Mu'min v. Virginia*, the Court suggested that one relevant consideration is the frequency of such a crime in the community. 500 U.S. 415, 429 (1991) (citing *Irvin v. Dowd*, 366 U.S. 717 (1961)). There, the Court distinguished the facts of the case before it from those in *Irvin*, finding that a community of over 3 million people where hundreds of murders are committed each year was much less likely to be prejudiced by media coverage when compared to a community of under 200,000 people where only nine murders had taken place in the relevant year. *Mu'min*, 500 U.S. at 429. It is not only the size of the community that the Court considered, but also its exposure to similar events. Here, an unprecedented event took place in the District of Columbia. Those who live in that community would understandably feel more connected to this historic event especially given the frequency of local media coverage. It is true that "given the size of the community… only the most damaging of information could give rise to any likelihood of prejudice." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991). However, given the extensive, persistent, and overwhelmingly negative press coverage of a unique event occurring in the District of Columbia, such a presumption is warranted here.

**(2) The Extent and Nature of the Press Coverage**

The press coverage surrounding the events of January 6 is of the nature that supports a transfer of venue to ensure a fair trial. A presumption of prejudice is warranted where the pretrial press coverage contains a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. The coverage of January 6 has been exactly of the kind that readers and viewers in the District to Columbia will

5

commit to memory – it includes dramatic live footage, inflammatory descriptions, as well as blatantly prejudicial information about those involved, including the Chwiesiuks specifically.

This extensive and ongoing media coverage has created prejudice in that it consistently assigns collective fault to all those who were present on January 6, creating a situation where potential jurors may hold the Chwiesiuks accountable for conduct other than their own.[6] The coverage frequently describes all those involved as soldiers in a war against the government. For example, they are "deluded rallygoers," who are intent to "wage war against a shadowy conspiracy of elites intent on destroying America."[7] In the Washington Post, they are the "'Make America Great Again' army" who "trapped lawmakers and vandalized the home of Congress in the worst desecration of the complex since British forces burned it in 1814."[8] They are on the wrong side of "a battle in a broader war over the truth and over the future of American democracy."[9] They are a "violent and lawless crowd,"[10] "insurrectionists,"[11] "extremists,"[12] "zealots,"[13] and "terrorists."[14] January 6 has been compared to the start of the Civil War,[15] as well as 9/11 and Pearl Harbor,[16] it has been

---

[6] *See generally* Govind Bhutada, *How News Media is Describing the Incident at the U.S. Capitol*, Visual Capitalist, (Jan. 16, 2021) (analyzing the language used to describe the event and the participants in 180 articles from the top news media websites over the 10 days following Jan 6), available online at: https://www.visualcapitalist.com/how-news-media-is-describing-the-incident-at-the-u-s-capitol/

[7] Rob Kuznia, *Assault on Democracy: Paths to Insurrection*, CNN, (June 2021), available online at: https://www.cnn.com/interactive/2021/06/us/capitol-riot-paths-to-insurrection/

[8] *The Attack: Before, During, and After*, Washington Post Staff Special Reporting, https://www.washingtonpost.com/politics/interactive/2021/jan-6-insurrection-capitol/ (last visited March 2, 2023).

[9] *Id.*

[10] https://www.washingtonpost.com/made-by-history/2023/01/11/jefferson-davis-trump-charges-confederacy/

[11] Luke Mogelson, *Among the Insurrectionists*, the New Yorker, (Jan. 15, 2021), available online at: https://www.newyorker.com/magazine/2021/01/25/among-the-insurrectionists

[12] Alan Feuer, *Key Findings From the Jan. 6 Committee's Report, Annotated*, New York Times, (Dec. 19, 2022), available online at: https://www.nytimes.com/2022/12/19/us/politics/jan-6-committee-key-findings.html

[13] Jennifer Rubin, *If Low-Level Zealots Can be Prosecuted for Jan. 6, so Can Trump*, Washington Post Opinions, (Aug. 8, 2022), available online at: https://www.washingtonpost.com/opinions/2022/08/02/guy-reffitt-sentenced-jan-6-trump/

[14] Charlie Savage, *Was the Jan. 6 Attack on the Capitol an Act of Terrorism?*, New York Times, (Jan. 7, 2022), available online at: https://www.nytimes.com/2022/01/07/us/politics/jan-6-terrorism-explainer.html

[15] https://www.washingtonpost.com/made-by-history/2023/01/11/jefferson-davis-trump-charges-confederacy/

[16] Jake Lahut, *Kamala Harris Compares January 6 to Pearl Harbor and 9/11 in Anniversary Speech at the Capitol*, Business Insider, (Jan. 6, 2022), available online at: https://www.businessinsider.com/kamala-harris-pearl-habor-911-comparison-jan-6-speech-2022-1

referred to as "a landmark stain on American democracy,"[17] or an "insurrection [that] gravely threatened democracy,"[18] and "put the lives of American lawmakers at risk."[19]

These articles use memorable and inflammatory language to describe all those involved as a violent mob, often without specifying that many who were present at the capitol that day are not accused of violence. The issue is not that the allegations are false. Many of those present on January 6 did take violent actions; the Chwesiuks, however, are not among those accused of violence. They allegedly entered the Capitol building after it has already been breached and remained inside for approximately 10 minutes. There are no allegations that either took part in violence or property damage. However, with consistent reporting that assigns collective fault to all participants the prospective jurors are likely to have preconceived notions about the Chwiesiuks guilt.

In addition to the prejudicial press coverage of the group, there has been significant reporting about police officers, like Karol Chwiesiuk, who were involved in the events of January 6.[20] These articles frequently either conclude or strongly suggest that a police officer accused of participating on January 6 is likely connected to white supremacy or far-right-wing groups. For example, one article refers to the involvement of off-duty police officers as a "worrisome aspect of the insurrection," in that these cases "offer a glimpse at the threat the FBI has warned about for years: that violent extremists could infiltrate police departments to gain intelligence and sabotage authorities."[21] It describes police officers who were involved as both anti-government and

---

[17] *See supra* note 7.
[18] Jalonick, et al., *Jan. 6 Committee Unveils Report, Describes Tump, 'Conspiracy,'* The Washington Times, (Dec. 22, 2022), available online at: https://www.washingtontimes.com/news/2022/dec/22/jan-6-committee-unveils-report-describes-trump-con/
[19] Select Committee to Investigate the January 6th Attack on the United States Capitol, Introductory Material to the Final Report (Dec. 19, 2022) at 56.
[20] *See e.g., Bart Jansen, Elephant in the Room: Police Grapple with Charges Against Officers in Jan. 6 Capitol Attack,"* USA Today, (May 5, 2022), available online at: https://www.usatoday.com/story/news/politics/2022/05/03/police-charged-jan-6-assault-obstructing-congress/7355516001/?gnt-cfr=1
[21] *Id.*

7

potentially connected to white supremacists.[22] The article reports that most police departments discovering their officers were involved want to "go with the severest departmental discipline," then specifically names Karol Chwiesiuk, and includes his photograph, as an example of an officer who has not been fired or forced to resign.[23] The Washington Post likewise reported on the possibility that police officers participating in January 6 could be infiltrators from white supremacy and far-right-wing groups who "encourage their young members to enter law enforcement," creating a "new threat which directly impacts [police department] ranks and also national security."[24]

Articles about the involvement of police officers further imply that officers should be held to a higher standard, risking potential jurors believing the same. The Washington Post notes that there is a "public appetite for officers to face harsh discipline for attending or taking a more hands-on role in the chaos"[25] There are frequent references to officers prior training and oaths to uphold the law, suggesting that they are more culpable than other citizens for their participation. For example, a Houston police chief and leader of the Major Cities Chiefs Association remarks that officers should know better, stating, "How, as an officer, do you not help out? How do you not understand that you shouldn't be there?"[26] Similarly, another source describes an officer who participated as both ignoring their training and "turn[ing] on their own."[27] Other media outlets are tracking the cases of law enforcement officers specifically, again suggesting that these cases should be handled differently, including Forbes,[28] the University of Chicago Project on Security and Threats as published in the

---

[22] *Id.*
[23] *Id.*
[24] Kimberly Kindy, et al., *Off-Duty Police Were Part of the Capitol Mob. Now Police are Turning in Their Own*, Washington Post, available online at: https://www.washingtonpost.com/national-security/2021/01/09/investigating-police-rioters/
[25] Kim Bellware, *Police Departments Across the U.S. Open Probes into Whether Their Own Members Took Part in the Capitol Riot*, Washington Post, (Jan. 9, 2021), available online at: https://www.washingtonpost.com/national-security/2021/01/09/investigating-police-rioters/
[26] *See supra* note 24.
[27] Josiah Bates, *At Least 28 Active Police Officers Now Linked to U.S. Capitol Riots*, Time (Jan. 17, 2021), available online at: https://time.com/5929398/police-officers-involved-capitol-riots-charges/
[28] Tommy Beer, *Here are the Police Officers and Other Public Employees Arrested in Connection to the Capitol Riot*, Forbes, (Jan. 18, 2021), available online at: https://www.forbes.com/sites/tommybeer/2021/01/18/here-are-the-police-officers-and-other-public-employees-arrested-in-connection-to-capitol-riot/?sh=1bfd906c3c45

Atlantic and Foreign Policy,[29] and the Appeal.[30] The Appeal further includes a publicly available spreadsheet with information on Mr. Chwiesiuk and all officers who were either present or have been charged in connection to January 6.[31]

In a Washington Post article about Karol Chwiesiuk's arrest, quotes from high level officials demonstrate how the media coverage suggests that a police officer is more culpable if he or she participated on January 6.[32] Chicago Police superintendent is quoted by the Post, stating, "the fact that a Chicago police officer has been charged in that attack on American democracy makes my blood boil."[33] The Post further quotes Chicago mayor Lori Lightfoot, stating, "you will not be paid by the taxpayers of this community… to be a hateful member of our community."[34] These quotes reinforce the same suggestion seen in other sources that the jury should hold a police officer more accountable than a civilian. Other articles include evidence that may be introduced against Mr. Chwiesiuk at trial, such as the content of text messages he allegedly sent, photographs, and video footage.[35] Articles further include comments from Chicago Mayor Lori Lightfoot that Mr. Chwiesiuk was "fomenting hate against our democracy," or that his involvement was "a total

---

[29] CPOST, *The Face of American Insurrection*, (June 7, 2022), available online at: https://storymaps.arcgis.com/stories/84fe30d503c742a692d05146d420c87f; Robert A. Pape, *The Jan. 6 Insurrectionists Aren't Who you Think They Are*, Foreign Policy, (Jan. 6, 2022), available online at: https://foreignpolicy.com/2022/01/06/trump-capitol-insurrection-january-6-insurrectionists-great-replacement-white-nationalism/ ; Robert A. Pape & Kevin Ruby, *The Capitol Rioters Aren's like Other Extremists*, The Atlantic, (Feb.2, 2021), available online at: https://www.theatlantic.com/ideas/archive/2021/02/the-capitol-rioters-arent-like-other-extremists/617895/
[30] Jonathan Ben-Menachem, *The Cops at the Capitol*, The Appeal, (Jan. 25, 2021), available online at: https://theappeal.org/the-cops-at-the-capitol/
[31] Spreadsheet compiled by Ben-Menachem is available online at: https://docs.google.com/spreadsheets/d/1nmvouTFgTjlFDHo_dX7tvPQv9NTWs-0jkZ2Ju8hQk8w/edit#gid=0
[32] Tom Jackman, *Chicago Officer Charged in Jan. 6 Riot Wore a Police Sweatshirt to the Capitol, U.S. Alleges*, Washington Post, (June 11, 2021), available online at: https://www.washingtonpost.com/local/legal-issues/chicago-police-officer-arrested-capitol-riot/2021/06/11/e2c49c6e-caef-11eb-afd0-9726f7ec0ba6_story.html
[33] *Id.*
[34] *Id.*
[35] Carma Hassan and Brad Parks, *Chicago Police Officer Charged in Connection to January 6 Capitol Riot*, CNN, (June 11, 2021), available online at: https://www.cnn.com/2021/06/11/politics/chicago-police-officer-charged-january-6-capitol-riot/index.html; Sara Burnett, *Chicago Police Officer Charged in Capitol Insurrection*, Associated Press, (June 11, 2021), available online at: https://apnews.com/article/donald-trump-il-state-wire-chicago-capitol-siege-fc2c9ea9787a84aad42732a5d09c7c9d

disgrace to the badge."[36] Others include descriptions of the GPS evidence that may be offered at trial, and claims that Mr. Chwiesiuk used racial slurs.[37] This pretrial publicity has prejudiced the prospective jurors against police officers accused of participating in January 6 and Mr. Chwiesiuk specifically.

While these articles are primarily about Karol Chwiesiuk, all reporting about Angieszka Chwiesiuk has referred to her in connection to Mr. Chwiesiuk. The headlines describe her as the sister of a police officer and consistently connect her to the case against her brother, as well as the evidence against him.[38] Because of this association in the press, and the fact that they will be tried together, any prejudice towards Karol Chwiesiuk for his former employment with the Chicago Police Department is likely to cause prejudice towards her as well.

Finally, it is important to note that while January 6 has received significant coverage nationally, media in the District of Columbia has covered the event significantly more than elsewhere in the country. A media research firm analyzed media coverage of January 6 in both the District of Columbia and Atlanta, Georgia in connection to a survey commissioned by the Federal Public Defender's office.[39] The comparison found that the Washington Post ran twice as many stories as

---

[36] Madison Hall, *Chicago Police Officer Accused of Entering US Capitol January 6 Riot*, Business Insider, (June 11, 2021), available online at: https://www.businessinsider.com/chicago-police-officer-allegedly-broke-into-capitol-on-january-6-2021-6

[37] Corbin Boiles, *Chicago Cop Donned Police Hoodie While Storming Capitol: FBI*, The Daily Beast, (June 11, 2021), available online at: https://www.thedailybeast.com/chicago-police-officer-karol-j-chwiesiuk-charged-over-capitol-riot?ref=scroll

[38] See e.g., Matt Masterson, *Sister of Chicago Police Officer Previously Charged in Jan. 6 Riot Now Also Charged with Breaching U.S. Capitol*, WTTW, (Dec. 19, 2022), available online at: https://news.wttw.com/2022/12/19/sister-chicago-police-officer-previously-charged-jan-6-riot-now-also-charged-breaching-us; Jason Meisner, *Sister of Chicago Cop Arrested on Charges Stemming form Jan. 6 U.S. Capitol Attack*, (Dec. 19, 2022), Chicago Tribune, available online at: https://www.chicagotribune.com/news/criminal-justice/ct-us-capitol-attack-jan-6-sister-of-chicago-police-officer-charges-20221219-ztrgae57dndofobvkctdo2ehte-story.html

[39] The survey was conducted by Select Litigation to assess the federal jury pool in the District of Columbia on behalf of the Federal Public Defenders Office of the District of Columbia. The defendants do not rely on the survey results themselves, which some judges in this jurisdiction have questioned in prior rulings. *See e.g., United States v. Rhine*, No. 21-CR-687, Dkt. 79 at 9-11 (Jan. 24, 2023). The defendants cite only to the market comparison data from News Exposure for its conclusion that publicity has been more widespread in this jurisdiction. The market comparison data from News Exposure is available online at: https://docs.google.com/spreadsheets/d/1-gGzNFhGmQPZAiRkoZjzTO8uqiq9Zve2I4L15mddpqU/edit#gid=0

the dominant newspaper in Atlanta, Georgia, the Atlanta Journal-Constitution, in 2021.[40] Further, the number of hits for web-based coverage of January 6 was four times greater in the District of Columbia than in Atlanta and local television in the District of Columbia broadcast 7,300 stories about January 6 compared to about 4,000 stories in Atlanta.[41] While any juror pool in the country will have some exposure to prejudicial press coverage, those residing in the District of Columbia have seen such coverage so often that prospective jurors "could not reasonably be expected to shut [it] from sight." *Skilling*, 561 U.S. at 382. In addition to the coverage in the District of Columbia, there has been extensive reporting on both defendants in local Chicago media outlets.[42] Thus, the defendants request transfer to any venue other than the Northern District of Illinois.

While it is unusual for a court to grant a transfer of venue based on a presumption of pretrial publicity, January 6 is an unusual case. It is likely the most documented crime in history.[43] With this torrent of visual evidence, the events are seared in the minds of many, especially those in the District of Columbia where the coverage is more pervasive and the event more impactful. Indeed, "the siege lasted just a few hours, but Washington has been living with the consequences ever since."[44] With nonstop coverage that assigns collective fault for the violence, suggests that police officers are more culpable if they participated, and identifies the defendants by name with details that may not be admissible at trial, the Court should transfer the case to another jurisdiction.

---

[40] News Exposure Media Comparison Findings and Conclusions, available online at: https://docs.google.com/spreadsheets/d/1-gGzNFhGmQPZAiRkoZjzTO8uqiq9Zve2I4L15mddpqU/edit#gid=0
[41] *Id.*
[42] *See e.g., Who is Karol Chwiesiuk, CPD Officer Accused of Storming U.S. Capitol?,* CBS Chicago, (June 11, 2021), available online at: https://www.cbsnews.com/chicago/news/who-is-chicago-police-officer-karol-chwiesiuk-charged-storming-us-capitol-riot-insurrection/; Jon Seidel, *Sister of Chicago Police Officer Charged in Capitol Riot Now Arrested*, Chicago Sun Times, (Dec. 19, 2022), available online at: https://chicago.suntimes.com/news/2022/12/19/23517251/capitol-attack-insurrection-2020-presidential-election-sister-chicago-police-officer-charged Chuck Goudie, *Federal Prosecutors Could Merge Jan. 6 Cases Against CPD Karol Chwiesiuk and his Sister Agnes, ABC 7 Chicago*, available online at: https://abc7chicago.com/january-6-riots-us-capitol-chicago-police-officer/12732595/
[43] Vera Bergengruen & W.J. Hennigan, *The Capitol Attack was the Most Documented Crime in History. Will That Ensure Justice?*, Time, (April 9, 2021), available online at: https://time.com/5953486/january-capitol-attack-investigation/;
[44] Phillip Elliot, *The Jan. 6 Hearing Laid Bare How D.C. is Still Recovering From that Awful Day*, Time, (June 10, 2022), available online at: https://time.com/6186499/jan-6-hearings-first-day-washington-consequences/

**(3) The Timing of Publicity and Trial**

While over two years have passed since the events that led to the charges, they remain highly publicized. In addition to frequent updates on the pending criminal cases, the publicity has increased due to the recent public hearings and the December 2022 release of the final report of the House Select Committee to Investigate the January 6th Attack on the United States Capitol.[45] Further, in only the last few days, reports indicate that House Speaker Kevin McCarthy granted Fox News host Tucker Carlson access to 41,000 hours of security footage from January 6 and further plans to provide access to January 6 defendants and the public as well.[46] There is no doubt that thousands of hours of newly obtained security footage will increase press coverage over the next few months, immediately before the Chwiesiuks trial. This unprecedented event is understandably holding the attention of the American public, but with the increased prevalence of such reporting in the District of Columbia and the community's deeper connection to these events, the Court should transfer this case to another District to ensure the defendants receive a fair trial.

### B.  If the Court Denies the Motion to Transfer Venue, the Court Should Grant Expanded Voir Dire

If the Court denies the motion to transfer, the Court should allow for expanded examination of prospective jurors to mitigate the concerns raised by the extensive pretrial publicity. Even if the Court ultimately finds that a presumption of prejudice is not warranted, it may become evident at the *voir dire* that "an impartial jury actually cannot be selected." *United States v. Haldeman*, 559 F.2d 31, 115 (D.C. Cir. 1976). In *Skilling*, the Court found that there was a "widespread community impact

---

[45] Aaron Blake, *Read the Jan. 6 Committee Report*, Washington Post, (Dec. 22, 2022), available online at: https://www.washingtonpost.com/national-security/2022/12/22/jan-6-committee-report-full-text/
[46] Raju, et al, *McCarthy Grants Access to Capitol Security Footage to January 6 Defendants*, CNN, (Feb. 28, 2023), available online at: https://www.cnn.com/2023/02/28/politics/capitol-security-footage-january-6-mccarthy/index.html

that necessitated careful identification and inspection of prospective jurors' connections to" the underlying events. 561 U.S. at 358. The Court thus approved of "extensive screening questionnaire[s]" and "follow up *voir dire*" as methods to find jurors whose connections to the underlying events "were either nonexistent or attenuated." *Id.*

Here, there is likewise a widespread community impact and even if a presumption is not warranted, the fact that many residents may have a connection to the events, either themselves or through a family member or friend, indicates that expanded *voir dire* is necessary. Thus, the defendants request permission for a written screening questionnaire and individual follow up questioning of prospective jurors to ensure that an impartial jury is selected.

### III.   Conclusion

For these reasons, the defendants, Karol J. Chwiesiuk and Agnieszka Chwiesiuk, respectfully request that this Court transfer this case to another jurisdiction or in the alternative, grant expanded *voir dire*.

Respectfully submitted,

*/s/ Nishay K. Sanan*
nsanan@aol.com

*/s/ Cece White*
cece@sananlaw.com

Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
Tel: 312-692-0360
Fax: 312-957-0111