UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
        v.

KAROL J. CHWIESIUK, *et al.*,
        Defendants.

Criminal Action No. 21-536 (CKK)

MEMORANDUM OPINION
(March 17, 2023)

This criminal case is one of several hundred arising from the insurrection at the United States Capitol on January 6, 2023. Defendants Karol J. Chwiesiuk and Agnieszka Chwiesiuk are charged by information with five misdemeanors. Before the Court is Defendants' [61] Motion to Transfer Venue. Defendants ask the Court to transfer their trial, currently scheduled to begin on May 1, 2023, to any district other than the Northern District of Illinois or, in the alternative, to grant them expanded examination of prospective jurors. Like every other court of this jurisdiction to consider the same argument,[1] and upon consideration of the briefing,[2] the relevant legal authorities, and the entire record, the Court shall DENY Defendants' Motion insofar as they

---

[1] *E.g.*, *United States v. Bochene*, 579 F. Supp. 3d 177, 181–82 (D.D.C. 2022); *United States v. Nassif*, ⸺ F. Supp. 3d ⸺, 2022 WL 4130841, at *8–10 (D.D.C. Sept. 12, 2022) (JDB); *United States v. Brock*, ⸺ F. Supp. 3d ⸺, 2022 WL 3910549, at *5–6 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Rhodes*, ⸺ F. Supp. 3d ⸺, 2022 WL 2315554, at *21-23 (D.D.C. June 28, 2022) (APM); *United States v. Garcia*, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at *15 (D.D.C. July 22, 2022).

[2] The Court's consideration has focused on:
- Government's Statement of Facts in Support of Criminal Complaint as to Karol J. Chwiesiuk, ECF No. 1-1 ("Karol Aff.");
- Government's Statement of Facts in Support of Criminal Complaint as to Agnieszka Chwiesiuk, ECF No. 40-1 ("Agnieszka Aff.");
- Defendants' Motion to Transfer Venue, ECF No. 61 ("Defs.' Mot.");
- Government's Opposition to Defendants' Motion to Transfer Venue, ECF No. 62 ("Gov.'s Opp'n"); and
- Defendants' Reply in Support of Motion to Transfer Venue, ECF No. 63 ("Defs.' Reply").

In an exercise of its discretion, the Court has concluded that oral argument would not be helpful in the resolution of the Motion.

request transfer to another venue. The Court shall also DENY Defendants' Motion to allow a written screening questionnaire during voir dire. The Court shall DENY AS MOOT Defendants' Motion for individual follow-up questioning of prospective jurors, as it is part of this Court's standard practice.

## I. BACKGROUND

### A. Certification of the 2020 Presidential Election and Capitol Riot

The Twelfth Amendment of the United States Constitution provides that, after the members of the Electoral College "meet in their respective states and vote by ballot for President and Vice-President," they "shall sign and certify [their votes], and transmit [them] sealed to the seat of government of the United States, directed to the President of the Senate." U.S. Const. amend. XII. The Vice President of the United States, as President of the Senate, must then, "in the presence of the Senate and House of Representatives, open all the certificates[,], and the votes shall then be counted." *Id.* To count the votes and "declar[e] the result" of the Electoral College, federal law mandates that "Congress shall be in session on the sixth day of January succeeding every meeting of the electors" and that "[t]he Senate and House of Representatives shall meet in the Hall of the House at the hour of 1 o'clock in the afternoon on that day." 3 U.S.C. §§ 15–16.

Pursuant to the Constitution and federal law, Congress convened in a joint session on 1:00 PM on January 6, 2021 to count the votes of the Electoral College and certify the results of the 2020 Presidential Election, which had taken place on November 3, 2020. See Agnieszka Aff. at 1; Karol Aff. at 1. With then-Vice President Michael R. Pence presiding, proceedings began and continued until 1:30 PM, when the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to debate and consider an objection to the Electoral College vote from the State of Arizona. *Id.* Vice President Pence continued to

2

preside in the Senate chamber. *Id.* Shortly before noon, then-President Donald J. Trump took the stage at a rally of his supporters staged just south of the White House. *Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021). Then-President Trump declared that the election was "rigged" and "stolen," and urged the crowd to "demand that Congress do the right thing and only count the electors who have been lawfully slated." *Id.* at 18 (cleaned up). During and after then-President Trump's speech, a mass of attendees marched on the Capitol. *See id.*

As they gathered outside the Capitol, the crowd faced temporary and permanent barricades and Capitol Police positioned to prevent unauthorized entry to the Capitol. *United States v. Rivera*, 607 F. Supp. 3d 1, 4–5 (D.D.C. 2022) (CKK). Although police "engaged in combat with the rioters to prevent them from… breaking police lines," the police were ultimately unsuccessful. *Id.* at 5 (internal quotation marks omitted). Rioters smashed through doors and windows to the Capitol building beginning shortly after 2:00 pm. *Id.* The insurrection "desecrated [the Capitol], blood was shed, and several individuals lost their lives." *Thompson*, 20 F.4th at 19. All told, "[t]he events of January 6, 2021 marked the most significant assault on the Capitol since the War of 1812." *Id.* at 18–19 (footnote omitted).

B. **Events Specific to Defendants**

Allegations of Karol and Agnieszka Chwiesiuk's actions are included in the Superseding Indictment and the Statement of Facts in support of their Criminal Complaints.[3] On January 3, 2021, Defendant Karol Chwiesiuk informed a friend via text message that he was "going to dc… To save the nation" and that he would "fuck up some commies." Karol Aff. at 7. He traveled

---

[3] "It is appropriate if not necessary to rely on other official documents for the specific factual allegations underlying the [ ] Indictment, as the indictment itself contains few, if any, details about [Defendant's] alleged conduct." *United States v. McHugh*, 583 F. Supp. 3d 1, 8 n.2 (D.D.C. 2022) (JDB); *accord United States v. Mostofsky*, Crim. Action No. 21-138, 2021 WL 6049891 at *1 (D.D.C. Dec. 21, 2021) (JEB).

from Chicago, Illinois to Washington, D.C. on January 5, 2021. *Id.* at 4. It can be assumed that his sister Agnieszka Chwiesiuk traveled with him; she resides in Chicago, and there was a hotel booked under her name that night. *Id.*; Agnieszka Aff. at 2. On January 6, 2021, both Defendants attended then-President Trump's rally at the Ellipse; they then walked to the U.S. Capitol building together. *Id.* at 5. Ms. Chwiesiuk entered the Capitol through the smashed doorway of the Senate Wing Door at approximately 2:58 pm. *Id.* at 7. Mr. Chwiesiuk also entered the Capitol building with the crowd of rioters. Karol Aff. at 17. Just after 2:58 pm, Mr. Chwiesiuk texted a friend with a selfie taken inside a Senator's office and the message "We inside the capital lmfao." *Id.* at 10–12. The two Defendants walked through the Capitol Crypt, where they took photos. *Id.* at 14–15; Agnieszka Aff. at 7–8. They then left through a broken window near the Senate Wing Door. *Id.* at 8; Karol Aff. at 14. Footage shows Ms. Chwiesiuk leaving at approximately 3:08 pm. Agnieszka Aff. at 9.

### C. Procedural History

Defendants were charged by [54] Superseding Information with: (1) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly or Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Entering or Remaining in a Room Designated for the Use of a Member of Congress, in violation of 40 U.S.C. § 5104(e)(2)(C)(i); (4) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (5) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Both Defendants have rejected plea offers extended by the Government. *See* Minute Order, Aug. 23, 2022 (Karol Chwiesiuk); Minute Order, Feb. 23, 2023 (Agnieszka Chwiesiuk). The parties have agreed to a trial date of May 1, 2023.

On March 3, 2023, Defendants Karol J. Chwiesiuk and Agnieszka Chwiesiuk filed the pending [61] Motion to Transfer Venue. The Motion asks the Court to transfer their trial, currently scheduled to begin on May 1, 2023, to another district or, in the alternative, grant them expanded examination of prospective jurors. The Government *sua sponte* filed a [62] Memorandum in Opposition on March 10, 2023. By Minute Order on March 10, 2023, the Court ordered Defendants to file a reply, in which they should address the Court's opinion in *United States v. Eicher*, No. 22-cr-038, 2022 WL 11737926 (D.D.C. Oct. 20, 2022). On March 14, 2023, Defendants filed their [63] Reply.

## II. LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury of the State and district wherein the crime [was allegedly] committed." U.S. Const. amend. VI. Criminal trials occur in the jurisdiction "where the said Crimes [were allegedly] committed." U.S. Const. art. III, § 2, cl. 3. Pursuant to Federal Rule of Criminal Procedure 21(a), upon a defendant's motion, "the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." In other words, "if extraordinary local prejudice will prevent a fair trial," transfer is "a basic requirement of due process." *Skilling v. United States*, 561 U.S. 358, 378 (2010). To determine prejudice, the Court considers the following factors: (1) "the size and characteristics of the community in which the crime occurred;" (2) whether media coverage of the crime "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" and (3) whether the time between the crime and the trial has "diminished" the "level of media attention." *Id.* at 382–83. A "presumption of prejudice… attends only in the

extreme case." *Id.* at 381.

### III. DISCUSSION

Before turning to Defendants' motion to transfer or, in the alternative, for expanded voir dire, the Court begins with discussing the default practice of this jurisdiction to conduct voir dire in order to determine whether a fair and impartial jury can be seated. *United States v. Haldeman*, 559 F.2d 31, 41 (D.C. Cir. 1976) (in Watergate trial, holding that voir dire was necessary to determine whether Washington, D.C. panel would be impermissibly prejudiced). "[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically in every kind of criminal case to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976). Only at voir dire does it become "evident" that "an impartial jury cannot be selected." *Haldeman*, 559 F.2d at 63. As *Haldeman* exemplifies, juries have been successfully seated in the face of national press coverage of events deeply damaging to American democracy. Transfer is the exception, not the rule, even in the most politically-charged and widely-reported cases. *United States v. Garcia*, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at *6 (D.D.C. July 22, 2022). As *Garcia* notes, courts of this jurisdiction "have had little difficulty qualifying enough jurors to empanel a jury" in cases arising from the insurrection. *Id.* at *10 (collecting cases); *see also* Minute Entry, *United States v. Rhodes*, Crim. A. No. 22-15 (APM) (Oct. 3, 2022) (empaneling jury in seditious conspiracy case against "Oathkeepers" militia). Given this context, Defendants face a high bar in establishing the prejudice necessary to warrant the extraordinary remedy of transfer.

A. **Motion to Transfer Venue**

After considering the three *Skilling* factors outlined above, the Court finds that Defendants have failed to demonstrate "extraordinary local prejudice" warranting transfer, *Skilling*, 561 U.S.

6

at 378, and therefore denies Defendants' requested relief of transfer to another district.

### 1. Size and Characteristics of D.C.

As for the first factor, Washington, D.C.'s "size and characteristics" weigh against transfer. The *Skilling* court recognized that there is a "reduced likelihood of prejudice where [the] venire [is] drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)); *see also United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019). Although Washington, D.C. has over 600,000 residents, Defendants estimate that the population of D.C. over eighteen years old is approximately 545,500. Defs.' Mot. at 3. But D.C.'s "population is greater in size than those few cases in which the Court has found that transfer to a different jurisdiction was constitutionally required" and it is "larger than population sizes that the Supreme Court has found reduced the likelihood of prejudice." *United States v. Rhodes*, No. 22-cr-0015, 2022 WL 2315554, at *21 (D.D.C. June 28, 2022) (listing examples, including *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), in which the Supreme Court found no presumption of prejudice despite a jury pool of only approximately 182,000). Every other court to consider this question in connection with a January 6 prosecution—including those in which the defendant raised the same argument as Defendants here regarding D.C.'s over-eighteen population—has found that D.C.'s size does not weigh in favor of a presumption of prejudice. *See United States v. Rhine*, No. 21-0687 (RC), 2023 WL 372044, at *2 (D.D.C. Jan. 24, 2023).

Defendants then argue that in D.C., "the community of prospective jurors was more directly affected by January 6 than those of other jurisdictions because the events resulted in a brief citywide curfew, an emergency order lasting for 15 days, and increased police presence, including thousands of national guardsmen," therefore necessitating transfer. Defs.' Mot. at 3. But, as the Government points out, "[m]any D.C. residents do not live or work near the Capitol

where the roads were closed and where the National Guard was deployed." Gov.'s Opp'n at 7; *accord United States v. Ballenger*, No. 21-719 (JEB), 2022 WL 16533872, at *3 (D.D.C. Oct. 28, 2022) ("Many potential jurors, however, have no such connection to those events, living and working in parts of the city that were unaffected by the attack or the efforts to respond to it."). Furthermore, as other courts in this District have found, Defendants' argument is "unpersuasive, as surely most crimes 'more directly' impact the local area than elsewhere, and courts have held that a fair trial is possible even where that impact is a result of particularly heinous crimes." *Rhine*, 2023 WL 372044, at *3; *see also Ballenger*, 2022 WL 16533872, at *3. Defendants next argue that "[r]esidents of the District of Columbia are more tied to the federal government," such as through employment at various federal agencies. Defs.' Mot. at 3. As other courts have held, "[v]ague insinuations that federal employees are biased by their employment represent 'exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection.'" *Ballenger*, 2022 WL 16533872, at *2 (quoting *United States v. Bochene*, 579 F. Supp. 3d 177, 181 (D.D.C. 2022) (denying transfer in January 6 case)). In addition, the number of D.C. residents who work as federal employees is far outnumbered by those who do not, ensuring that there would be a sufficient jury pool even if, *arguendo*, all federal employees were excluded. *See* Gov.'s Opp'n at 9.

In sum, the size and characteristics of Washington, D.C. do not merit a presumption of prejudice against Defendants that would support transfer.

### 2. Media Coverage of the Crime

Under the second *Skilling* factor, although there has and continues to be substantial news coverage of the insurrection and the proceedings arising therefrom, "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors

8

have been exposed to this publicity." *See United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995).  It must also be noted that this news coverage is national; every major national outlet has devoted substantial coverage to the insurrection generally.  Local press has also covered the insurrection, and most communities throughout the country have been exposed to substantially similar coverage as Washingtonians.  *See United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[P]recedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, allowing the change to serve its purpose.").  The press coverage of January 6 rioters generally does not warrant transfer.  This conclusion has been reached myriad times by courts in this District.

Defendants state that in addition to this general press coverage, "there has been significant reporting about police officers, like Karol Chwiesiuk, who were involved," Defs.' Mot. at 7, and that this coverage distinguishes their case from others in which courts have denied transfer in January 6 cases, Defs.' Reply at 2.  In Defendants' view, numerous articles "conclude or strongly suggest that a police officer accused of participating on January 6 is likely connected to white supremacy or far-right-wing groups," while others "imply that officers should be held to a higher standard" and are "more culpable if he or she participated on January 6. *Id.* at 7–9.  They then cite to various articles that mention Karol Chwiesiuk by name and include information about his time as a police officer; photographs, video footage, and content of text messages he allegedly sent; and claims that he used racial slurs. *Id.* at 7–9.  In one such article, Chicago Mayor Lori Lightfoot is quoted as stating that Mr. Chwiesiuk's involvement was "a total disgrace to the badge." *Id.* at 9–10 (citing Madison Hall, *Chicago Police Officer Accused of Entering US Capitol January 6 Riot*, Business Insider, (June 11, 2021, 5:31 PM), https://www.businessinsider.com/chicago-police-officer-allegedly-broke-into-capitol-on-january-6-2021-6).  Defendants then state that "all

9

reporting about Angieszka Chwiesiuk has referred to her in connection to Mr. Chwiesiuk," with "headlines describ[ing] her as the sister of a police officer." *Id.* at 10.  They continue that "[b]ecause of this association in the press, and the fact that they will be tried together, any prejudice towards Karol Chwiesiuk for his former employment with the Chicago Police Department is likely to cause prejudice towards her as well." *Id.*  Finally, Defendants contend that there has been "extensive reporting on both defendants in local Chicago media outlets" in addition to outlets in D.C. *Id.* at 11.  It is for this reason that they request a transfer to any district other than the Northern District of Illinois.  *Id.*

The Court has reviewed the numerous articles cited by Defendants and finds that they do not rise to the level of prejudice required by *Skilling*.  "[O]nly pretrial publicity analogous to the 'inherently prejudicial' and 'unforgettable… spectacle of [a defendant's] dramatically staged and broadcast confession' is inflammatory enough to presume prejudice." *Brock*, 2022 WL 3910549, at *7 (citing *Haldeman*, 559 F.2d at 61).  The Court recognizes that some of the articles Defendants cite do include pointed language, including statements from public officials casting blame on Karol Chwiesiuk.  However, the fact that some coverage may be "hostile in tone and accusatory in content" is not enough to show prejudice when "[t]he overwhelming bulk of the material submitted… consists of straightforward, unemotional factual accounts of events." *Haldeman*, 559 F.2d at 61 (footnote omitted).  Other courts in this District have likewise held that even where articles refer to Defendants specifically, it does not necessarily warrant transfer.  *See Rhine*, 2023 WL 372044, at *3.  For it is true that "[e]ven in the most high-profile cases, courts reject challenges where the defendant cannot show that members of the venire have knowledge of or an opinion about the defendant himself, even when he was a part of a highly publicized event." *Brock*, 2022 WL 3910549, at *8 (citing *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (rejecting

10

World Trade Center bombing suspect's bias claim because "the jurors that were picked had either never heard of Yousef or could not remember any of the details of his alleged involvement")); *see also In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

The Court finds that the media coverage of January 6, 2021, as well as about Defendants specifically, does not support transfer.

### 3. Time Between Crime and Trial

Finally, as for the third *Skilling* factor, while it is true that there remains press coverage on the insurrection and its ramifications for American democracy, such coverage is not sufficient to justify a transfer. Defendants' trial is scheduled to begin on May 1, 2023—well over two years after the events of January 6, 2021.

Defendants argue that the events of January 6 "remain highly publicized" and point to the December 2022 release of the final report of the House Select Committee to Investigate the January 6 Attack on the United States Capitol as well as reports that House Speaker Kevin McCarthy gave Fox News host Tucker Carlson security footage from January 6. Defs.' Mot. at 12. They also include, in footnotes, citations to articles about Angieszka Chwiesiuk from December 2022, *see* Defs.' Mot at 10 n. 38, 11 n. 42, which is when the Government issued their Criminal Complaint as to Ms. Chwiesiuk, *see* Sealed Complaint, ECF No. 40 (Dec. 16, 2022). But while media coverage of January 6 has continued, particularly around the anniversary of the event and with other recent updates that Defendants highlight, "it no longer dominate[s] the news and ha[s]

11

become less intense than it was in the immediate aftermath of the riot." *Garcia*, 2022 WL 2904352, at *9 (citation omitted).  Other courts in this District have suggested that coverage of the House Select Committee might actually be *helpful* to individual January 6 defendants, as that coverage has "shifted media focus from the rioters to the actions of high-level officials" and "concerned the responsibility of persons other than [a] defendant" such as the Chwiesiuks. *United States v. Oliveras*, No. 21-738 (BAH), 2023 WL 196679, at *3 (D.D.C. Jan. 17, 2023). Nevertheless, even if news and media coverage has not faded in prospective jurors' minds, such coverage does not rise to the level necessitating transfer for the same reasons discussed above. *Accord Nassif*, —— F. Supp. 3d ——, 2022 WL 4130841, at *10 (D.D.C. Sept. 12, 2022) (JDB).

The Court therefore finds that the third *Skilling* factor weighs against a transfer.

\*        \*        \*

The Court will deny Defendants' Motion to Transfer to another judicial district.  As the Court has noted above—both explicitly and through citations to case law—judges in this District have consistently rejected similar arguments and denied similar motions to that of Defendants. *See Oliveras*, 2023 WL 196679, at *3 (collecting cases).  Additionally, courts in this District have had little difficulty qualifying enough jurors to empanel juries in January 6 cases.  *See Garcia*, 2022 WL 2904352, at *10 (collecting cases).  Defendants have failed to present any persuasive information or argument that would cause this Court to step out of line with this vast agreement.

### B. Motion to Grant Expanded Voir Dire

Defendants then argue that if this Court denies their Motion to Transfer, it should "allow for expanded examination of prospective jurors to mitigate the concerns raised by the extensive pretrial publicity."  Defs.' Mot. at 12.  They "request permission for a written screening questionnaire and individual follow up questioning of prospective jurors to ensure that an impartial

jury is selected." *Id.* at 13.

Numerous courts in this District have empaneled juries in January 6 cases without utilizing expanded voir dire, even in cases involving defendants with far greater and more inflammatory news coverage than at issue here. *See Garcia*, 2022 WL 2904352, at *10 (collecting cases); *United States v. GossJankowski*, Crim. No. 21-0123 (PLF), 2023 WL 395985, at *7 (D.D.C. Jan. 25, 2023) (collecting cases). The Court is aware of only one judge in this District who has granted a request to use a juror questionnaire in a January 6 trial. *See* Order, *United States v. Alford*, Crim. A. No. 21-263 (Apr. 18, 2022) (TSC), ECF No. 46. Other judges have declined to adopt any special voir dire procedures at all. *See, e.g.*, *Nassif*, 2022 WL 4130841, at *11. The Court finds that Defendants' request for a questionnaire fails for the same reasons as their request for a transfer: such a mechanism is not necessary to ensure the empanelment of a full and impartial jury. Accordingly, in line with the majority of courts in this District, the Court declines to grant Defendants' request for a juror questionnaire.

However, the Government does not object to Defendants' request to perform individual follow-up questioning of perspective jurors. Such practice has been granted by some judges in this District. *See Rhine*, 2023 WL 372044, at *5; Gov.'s Opp'n at 28–29 (discussing voir dire *United States v. Reffitt*, 21-CR-32 (DLF)). More importantly, this Court's standard practice is to engage in a follow-up voir dire with questioning of each prospective juror separately. As explained in the Court's trial procedures order, which shall be posted in this case prior to the May 1, 2023 trial date,

> [m]embers of the jury panel will be seated in the courtroom in the order in which they are listed on the jury sheets, attendance will be taken by the courtroom clerk, and the panel will be sworn in. The jury panel will be introduced to all of the participants in the trial and the Court will ask them a series of questions. If a panel member's answer to any question is "yes," the member will be asked to write the number of the question on a note card. At the end, each member of the jury panel

will be questioned in open court to answer any questions he or she has listed on the card. At that time, counsel may pose brief follow-up questions.

The Court therefore will deny as moot Defendants' request for individual follow-up questioning of perspective jurors, as it is already part of this Court's standard practice.

### IV. CONCLUSION

In sum, the Court shall DENY Defendants' Motion. None of the *Skilling* factors merit the extraordinary remedy of transfer in this case; therefore, consistent with binding appellate precedent, every other court of this jurisdiction to consider the question, and the foregoing reasons, the Court shall DENY Defendants' Motion insofar as they request transfer to another venue. The Court shall also DENY Defendants' Motion to allow a written screening questionnaire during voir dire. Finally, the Court shall DENY AS MOOT Defendants' Motion for individual follow-up questioning of prospective jurors as it is already part of this Court's standard practice.

An appropriate Order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge