UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO. 21-CR-536 (ACR) |
| | : | |
| [1] KAROL J. CHWIESIUK, | : | |
| [2] AGNIESZKA CHWIESIUK, | : | |
| | : | |
| Defendants. | : | |

GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR ACQUITTAL PURSUANT TO RULE 29

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum in opposition to the defendants' combined post-trial motion for a judgment of acquittal. ECF No. 117. A reasonable and rational jury convicted the defendants on Counts 1, 2, 4, and 5 of the Superseding Information, and the defendants have failed to meet the "highly deferential" standard that this Court must apply to a jury verdict. This Court should therefore deny their motion in all respects.

I.    BACKGROUND

The trial began on August 7, 2023, and concluded after the jury returned a verdict of guilty as to both defendants on Counts 1, 2, 4, and 5 of the Superseding Indictment on August 11, 2023. Minute Entry (Aug. 7, 2023), Minute Entry (Aug. 11, 2023). On August 9, 2023, at the close of the government's case, the defendants moved for Judgment of Acquittal as to all counts pursuant to Fed. R. Crim. P. 29. Minute Entry (Aug. 9, 2023). Except for Count 3, upon which the Court reserved decision, the Court denied the motion outright. *Id.* In doing so, the Court reasoned,

> I think there is more than enough evidence for a jury to infer that they knowingly
> went into restricted grounds, and that was all the barriers that were up the night
> before, the picture of Mr. Chwiesiuk there, the planning that went into going into
> the Capitol, listening to the President's speech, knowing that the Senate and the
> House were in session, knowing that people don't usually go into government
> buildings through windows, seeing windows that had been broken out, going in

through a door that was off the hinge.  I think there's more than enough evidence there on Counts 1 and 2.

I think that there's enough evidence there on Counts 2 and 4 that they were there to disrupt the proceedings.  That was the whole purpose of everyone going to the Capitol building.  And I think that a jury can make that inference.

Trial Tr. (Aug. 9, 2023), pp. 143-44.

After the defendant (Mr. Chwiesiuk) testified and the defendants rested their case, the defendants briefly renewed their motion for a judgment of acquittal.  Minute Entry (Aug. 10, 2023); Trial Tr. (Aug. 10, 2023), pp. 135-36.  The Court held its decision in abeyance.  *Id*.  After the jury convicted the defendants on Counts 1, 2, 4, and 5 of the Superseding Information, the Court indicated that it was inclined to deny the defendants' Rule 29 motion but held its decision in abeyance and set a post-trial motion schedule.  Trial Tr. (Aug. 11, 2023), p. 29.  The defendants filed their motion on September 25, 2023.  ECF No. 117.  Defendants' motion raised the same arguments and issues the defendants raised during their oral argument during trial and relied heavily on the transcript from District Judge McFadden's bench verdict in *United States v. Martin*, 21-CR-394 (TNM), ECF No. 41 (D.D.C. Apr. 6, 2022), in which the court acted as the factfinder and to which a different standard applies.  Defendants' motion fails, however, to identify any new, novel, or persuasive reason why this Court must disturb the sanctity of the jury's verdict.  The government asks this Court to deny defendants' motion in its entirety.

## II.   LEGAL STANDARD

Federal Rule of Criminal Procedure 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  When considering such a motion, the Court must "consider[] th[e] evidence in the light most favorable to the government" and uphold a guilty verdict if "any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002).  Put another way, the Court must determine whether "a reasonable juror must necessarily have had a reasonable doubt as to the defendants' guilt." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983).  If a defendant has not met Rule 29's "demanding standard," their motion should be denied in its entirety. *United States v. Borda*, 768 F. Supp. 2d 289, 292 (D.D.C. 2011).

At one point in their motion, defendants misstated the standard by which a Court must view their motion for acquittal.  Specifically, when listing the elements of Count 1, defendants incorrectly claimed, "**[T]he Court must find** the following beyond a reasonable doubt . . . "  ECF No. 117, pp. 2-3 (emphasis added).  This is incorrect.  At this stage of the criminal proceedings, the Court does not need to find anything beyond a reasonable doubt.  The jury has already found that the defendants committed the alleged offenses beyond a reasonable doubt.  Here, the Court need only be satisfied that a rational jury could have done what, in this case, a jury did. *Wahl*, 290 F.3d at 375.

## III.    ANALYSIS

This Court already heard and rejected most of the arguments presented in the defendants' brief when the defendants made those selfsame arguments during trial.  This Court found then that there was "more than enough" evidence for a reasonable jury to find that the defendants committed the violations alleged in Counts 1, 2, 4, and 5.  Trial Transcript (Aug. 9, 2023), pp. 143-44.  The Court did have concerns about the sufficiency of the government's evidence as to Count 3, but since the jury acquitted on that Count, those arguments are no longer relevant.  The only thing that has changed from the time the Court made those findings to the present time is Mr. Chwiesiuk gave testimony and was subject to cross examination.  The jury then proceeded to convict Mr. and Ms. Chwiesiuk on Counts 1, 2, 4, and 5 of the Superseding Indictment.

### a. *Count One—Entering or Remaining in a Restricted Building or Grounds*

18 U.S.C. § 1752(a)(1) makes it unlawful to "knowingly enter[] or remain[] in any restricted building or grounds without lawful authority to do so." Defendants "do not contest that they entered a restricted building or grounds." ECF No. 117, p. 3. Their sole contention here is that they did not act knowingly. *Id*. As the parties agreed, and as the Court instructed the jury,

> A person acts "knowingly" if he or she realizes what he or she is doing and is aware of the nature of his or her conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant knowingly entered or remained in a restricted building, you may consider all of the evidence, including what the defendant did, said, or perceived.

ECF No. 103, p. 8. As this Court recognized in denying the defendants' first motion for a judgment of acquittal, there was ample evidence presented by the government at trial that the defendants knew that both the grounds and the building were restricted, including evidence that,

> all the barriers that were up the night before, the picture of Mr. Chwiesiuk there, the planning that went into going into the Capitol, listening to the President's speech, knowing that the Senate and the House were in session, knowing that people don't usually go into government buildings through windows, seeing windows that had been broken out, going in through a door that was off the hinge.

Trial Tr. (Aug. 9, 2023), pp. 143-44. Additionally, Mr. Chwiesiuk testified, and evidence showed, that Mr. Chwiesiuk texted an individual on January 3, 2021, that he was going to Washington, D.C., to "save the nation." Trial Tr. (Aug. 10, 2023), p. 79; Gov't Ex. 708. Mr. Chwiesiuk openly recognized that he was there to support the former president and he scouted out the Capitol in the evening hours of January 5, 2021. Gov't Ex. 401-004, 401-006, 405, 406, 407, 408, 409. In many of Mr. Chwiesiuk's selfie photographs in front of the U.S. Capitol, both the bike rack and snow fence styles of barriers can easily be seen in the background, as can the large white signs with large red letters reading AREA CLOSED. Gov't Ex. 409. In his text messages on January 6, 2021, prior to entering the Capitol, Mr. Chwiesiuk had text exchanges with several individuals in which he talked about how the former president was leading them "to the fucking capital" (Gov't Ex.

401-009), about how other rioters "stole a lift" (Gov't Ex. 401-010), about having to "save America" (Gov't Ex. 403-034), and about being "inside" (Gov't Ex. 403-050).  When asked twice by the same person about breaking into the Capitol, Mr. Chwiesiuk responded only with, "Goin in."  Gov't Ex. 401-010.  He would later send that same person multiple photos from on restricted grounds and inside the Capitol (Gov't Ex. 401-012 to 401-014), tell him that "shit was nutzzzzzzz" (Gov't Ex. 401-015) and discuss what Mr. Chwiesiuk's friend would have stolen if he had gone to the Capitol.  Gov't Ex. 401-016.  Mr. Chwiesiuk mentioned that he "was trying to [find] a fuckibg flag.  But they took em all."  Gov't Ex. 401-017.  A day after the events of January 6, 2021, Ms. Chwiesiuk texted her brother a screenshot with images, including one of the West Front of the U.S. Capitol on January 6, 2021, with the text, "I'm tired of hearing people say 'this is not American.  This isn't who we are'.  It's the most American thing I've seen in my lifetime."  Gov't Ex. 402-030, 402-031.

### 1.      The Good Faith Argument Fails

Defendants attempt to establish that no reasonable or rational juror could have convicted either Mr. or Ms. Chwiesiuk because "there was evidence that they acted under a good faith belief." ECF No. 117, p. 5.  Defendants specifically identify the evidence that they believe supports this conclusion—which is all drawn from Mr. Chwiesiuk's trial testimony.  *Id*.  The jurors in this case received *all* the evidence, they heard the arguments made by defense counsel, and they rejected them.  The decision of whether the presented good faith defense amounted to reasonable doubt was the jury's decision to make; the fact that there "was evidence" supporting the defense theory does not mean that the jury could not discredit that evidence and reject the theory.  The jury weighed all the evidence and the defendants' arguments, and ultimately convicted the defendants. The defendants provide no compelling reason to disturb that conviction.

## 2.      The Disappearing Barriers Argument Fails

In their motion, the defendants also returned to the absurd idea that the numerous barricades and fencing systems put in place by the United States Capitol Police somehow disappeared before Mr. and Ms. Chwiesiuk arrived.  At one point the defendants claimed that by the time the Chwiesiuks entered the restricted grounds, "the barricades, including fencing or bike racks, were removed and no longer blocked the path nor visually provided notice that the area was restricted." ECF No. 117, p. 4.  This is factually incorrect and ignores USCP Captain Baboulis' testimony.  On direct examination, Capt. Baboulis spoke of four to five layers of security that had been established, and testified that the snow fencing, bike racks, and AREA CLOSED signs "were all not removed"; the witness agreed with the clarification that these signs and barriers in fact "were present throughout the day."  Trial Tr. (Aug. 8, 2023), p. 69.

During cross examination, defense counsel only asked questions about a single sidewalk— the Pennsylvania Walkway on the West Side of the Capitol.  *Id*. at 115.  Defense counsel even emphasized that he was "talking about the sidewalk specifically" and was "not talking about the other areas on the grass or other areas, I'm talking about specifically that sidewalk."  *Id*. at 115- 16.  During his questioning, even defense counsel appeared to recognize that the barrier did not disappear, but that "the large crowds *were stepping over it*."  *Id*. at 117 (emphasis added).  There were several questions about whether that specific barrier (the one on the Pennsylvania Walkway) was ever "re-established," but no witness ever testified that all barriers were "removed" and no evidence at trial supports the defendants' assertion that all fencing and bike racks were removed or no longer visible to anyone traversing the area.  *Id*. at 116-18; ECF No. 117, p. 4.  Metal bike racks, large sheaths of plastic snow fencing, and a multitude of signs with the words AREA CLOSED do not disappear when breached by rioters.

In their motion for acquittal, defendants rely on a single line of questioning of Capt. Baboulis referring to a specific location on a specific sidewalk using the word "reestablish," and then they extrapolate it out to claim that by 2:57 p.m., "there were no longer any barricades indicating the grounds were restricted . . . [and] there was no evidence presented to demonstrate that they knew such areas were restricted." ECF No. 117, p. 4.  On the contrary, there was ample evidence presented through which a rational juror could—and did—conclude that the defendants knew the area was restricted.

Both at trial and in their motion, defense counsel also attempted to launch an attack on the government's evidence based on a line questioning during Ofc. Borradaile's testimony that defendants take out of context.  Here is the line of questioning in full:

| | |
|---|---|
| **AUSA Murphy:** | What happened? |
| **Ofc. Borradaile:** | At that particular point, the crowd had grown so large, I was looking out and looking at the bicycle racks, the crowd, it's what seemed like in unison, just pushed through the bicycle racks, over the top, around them, and charged through in a loud roar towards the officers, towards the Capitol on the east front. |
| **AUSA Murphy:** | When the barriers fell over, did they cease to exist? |
| **Ofc. Borradaile:** | They were laid out on the ground completely flattened out, yes. |
| **AUSA Murphy:** | Well, I'm sorry, did they disappear? |
| **Ofc. Borradaile:** | As far as a sea of people running over them, it – it would disappear from my vision, yes.  I couldn't see them because of the people going over the top of them. |
| **AUSA Murphy:** | But they were still physically present; correct? |
| **Ofc. Borradaile:** | Yes. |
| **AUSA Murphy:** | What was your -- going through your head as the rioters broke through that line? |

| **Ofc. Borradaile:** | What was going through my head at that point was, quite frankly, I thought I was going to die. |
|---|---|
| **AUSA Murphy:** | Did this feel like just another day at the Capitol? |
| **Ofc. Borradaile:** | No. |
| **AUSA Murphy:** | Did this feel like a normal tourist group? |
| **Ofc. Borradaile:** | No. |
| **AUSA Murphy:** | Did it feel like a normal protest to you? |
| **Ofc. Borradaile:** | No. |

Trial Tr. (Aug. 9, 2023), pp. 133-34.  It is also worth noting that this Court has heard and rejected this same argument from the defendants, as follows:

| **Mr. Sanan:** | I think they show up to the grounds about 2:35, Mr. and Ms. Chwiesiuk.  By that point, the officer testified -- and he used the word -- no one made him use the word -- the barriers disappeared.  And they didn't run -- if you follow the testimony, the government's and Mr. Chwiesiuk, they followed the -- |
|---|---|
| **The Court:** | The barriers didn't disappear.  I mean, I saw them on the video. |

Trial Tr. (Aug. 10, 2023), p. 217.  Indeed, the barriers did not disappear.[1]

If anything, in the context of everything else that was happening at the Capitol, a reasonable jury could find that a set of trampled barriers surrounded by a mob "push[ing] through[,]" "over[,]" and "around" them, Trial Tr. (Aug. 9, 2023), pp. 133, should act as an equivalent or even more severe deterrent than a barrier that is undisturbed.

---

[1] The defendants are perhaps envisioning the Mushroom Kingdom where bricks vanish and Goombas disappear when a plumber in a red hat strikes them or stomps on them, respectively. This is not the Mushroom Kingdom, and that was not the evidence at trial.  (The undersigned recognizes that along with his reference to Hogwarts in the Closing Argument, this is the second time the government has used a fictitious setting to aid in its refutation of the disappearing barriers argument.  It is difficult, however, to engage on this point without comparisons to a fantasy world, because in the real world, what the defendants are saying happened simply does not happen.)

### 3.  Reliance on *Martin* is Misplaced

Defendants also devoted sections of their motion making comparisons to the transcript in a prior case where Judge McFadden, as the trier of fact in a bench trial, made certain findings and determinations based on the evidence that was presented to him.  *United States v. Matthew Martin*, 21-CR-394 (TNM), ECF No. 41.  In Judge McFadden's analysis of the sufficiency of the evidence in *Martin*, Judge McFadden was the one deciding whether the evidence established guilt or not.  Here, the jury has already done that.  By their drawn-out appeal to *Martin* and Judge McFadden's findings, the Chwiesiuks seem to be addressing less the standard for a Rule 29 judgment of acquittal and more attempting to try their case a second time, but this time as a bench trial where the Court may do no more than adhere to Judge McFadden's findings in *Martin*.

Putting aside the legal and procedural differences in the two cases, the facts are also significantly different.  As Chief Judge Boasberg recognized in *United States v. Ballenger*, 21-CR-719 (JEB), 2023 U.S. Dist. LEXIS 122992, at *27 (D.D.C. July 18, 2023), the situation at the Senate Wing Door, where the Chwiesiuks entered the Capitol, was different from the situation on the East Front of the Capitol, where the defendant in *Martin* entered the Capitol.  The Chwiesiuks approached through an area where there were layers of barriers.  Chemical agents filled the air, invading one's senses of smell, taste, sight, and feel.  As Capt. Baboulis testified, about what she experienced on January 6, 2021, during the riot at the Capitol,

> You can be anywhere within a hundred yards and you can taste the chemicals in the air.  You can feel them.  Because of the amount of chemicals that consumed the air, I mean, anywhere you were, you can kind of feel and taste them.  Regardless, again, you can be 50 yards away and still know that it was present in the air.

Trial Tr. (Aug. 9, 2023), pp. 94-95.

As the evidence showed, and as Mr. Chwiesiuk himself testified, they wanted to go to the Capitol.

**AUSA Murphy:**         And you wanted to go to the Capitol, right?

**Mr. Chwiesiuk:**        Oh, yeah. Yes.

Trial Tr. (Aug. 10, 2023), p. 90.  The Chwiesiuks walked from President's Park down to the Peace Circle. When they found the direct route to the Capitol to be overly congested, they found another way and went around on the North Lawn, with Mr. Chwiesiuk running across the lawn and hopping over a short wall or curb.  *Id*. at 88-92.  Once they arrived at the NW Plaza, the Chwiesiuks once again found the area to be heavily congested.  Folks were yelling and chanting.  One rioter was getting a bottle of water dumped on his face.  The crowd was chanting, "Fight for Trump! Fight for Trump!"  *Id*. at 95.  Mr. Chwiesiuk described it as "tremendously" loud.  *Id*. at 97.  He noticed that all the windows around the plaza were cracked or broken.  *Id*.  Mr. Chwiesiuk recognized that audible alarms are to notify everyone that "something is happening," and although he denied hearing them at the time, he admitted that he could hear them on the video evidence showing him and Ms. Chwiesiuk entering the Capitol.  *Id*. at 98.  In Gov't Ex. 800, a loud alarm may be heard blaring as Mr. and Ms. Chwiesiuk enter the United States Capitol through a broken-out door flanked by two broken-out windows.  Mr. Chwiesiuk also noted (and the evidence clearly shows) the presence of individuals in tactical gear, the presence of individuals that were smoking marijuana, and individuals that were climbing in through and out of the broken-out windows.  The government presented all this evidence and more to the jury.  A hypothetical reasonable jury presented with this evidence could convict, and an actual reasonable jury that was presented with this evidence did convict, and this Court should uphold that conviction.  Accordingly, this Court should not credit the defendants' claim that no reasonable jury could find that the Chwiesiuks acted knowingly when they entered the Capitol and deny their motion as to Count One.

**b.  *Count Two—Disorderly or Disruptive Conduct in a Restricted Building or Grounds***

Count Two charges a violation of 18 U.S.C. § 1752(a)(2), which prohibits,

> knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions.

At trial, the government presented sufficient evidence for a reasonable jury to conclude (1) that the defendants engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building; (2) that they did so knowingly and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) that the defendants' conduct occurred when, or so that, their conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.  18 U.S.C. § 1752(a)(2); ECF No. 103, p. 9.

### 1.  There Was Ample Evidence that the Defendants Engaged in Disorderly or Disruptive Conduct

As the parties agreed and as the Court instructed the jury at trial, "Disorderly conduct is conduct that tends to disturb the public peace or undermine public safety.  Disruptive conduct is a disturbance that interrupts an event, activity, or normal course of a process."  Trial Tr. (Aug. 10, 2023), p. 151; ECF No. 103, p. 9.  In the Court's Proposed Jury Instructions, this proposed definition was accompanied by footnote 3, which read,

> *United States v. Grider*, 21-cr-22 (CKK) (ECF No. 150 at 24) ("'[D]isorderly' conduct is that which 'tends to disturb the public peace, offend public morals, or undermine public safety.'  'Disorderly,' Black's Law Dictionary (9th ed. 2009); *see also* 'Disorderly,' Oxford English Dictionary (2nd ed. 1989) ('Not according to order or rule; in a lawless or unruly way; tumultuously, riotously.')").

In a recent bench trial before the Chief Judge, the government recognized that the defendants "did not 'yell[], break[] things, block[] people, jostl[e],' or 'threaten[] in some manner,' and that their disruptive conduct consisted of their 'being part of th[e] mob' that stormed the

Capitol, even if their outward contribution to that mob consisted of little more than 'walk[ing] in' with its members." *United States v. Ballenger*, 21-CR-719 (JEB), 2023 U.S. Dist. LEXIS 122992, at *14 (D.D.C. July 18, 2023). Chief Judge Boasberg convicted both defendants of violating 18 U.S.C. § 1752(a)(2). In doing so, the Chief Judge reasoned, "Context and circumstances always matter. A person standing on a public sidewalk scanning the street commits no crime, but he certainly does so if he is acting as a lookout for others committing a burglary next door." *Id*. at *15. He also cites to Judge Kollar-Kotelly and her reasoning, "Even mere presence in an unlawful mob or riot," she explained, is "'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants." *United States v. Rivera*, 607 F. Supp. 3d 1, 8 (D.D.C. 2022); *see also United States v. Griffith*, 21-CR-244-2, 2023 U.S. Dist. LEXIS 84966 at *6 (D.D.C. May 16, 2023) ("[E]ven mere presence in these circumstances is in fact disruptive.") (citing *Rivera*, 607 F. Supp. 3d at 9).

The defendants asked this Court to apply the Court's findings in *Martin*, wherein Judge McFadden credited one specific defendant's testimony that he himself was "quiet and orderly." ECF No. 117, p. 7. The defendant in *Martin* came from the East Plaza of the Capitol through the East Rotunda Doors. The situation there was different from the violence, the destruction, and the chaos of the West Plaza, the NW Courtyard, and the Senate Wing Door. As the government's evidence in this case showed, the Chwiesiuks encountered a large and unruly crowd just as they crossed onto restricted grounds, they saw the chaos and commotion of the NW Plaza (Gov't Ex. 301, 302), they heard people yelling things inside the Capitol like, "Whooooo! We in this motherfucker!" (Gov't Ex. 303), they saw people standing on furniture and chanting things like "Fight for Trump! Fight for Trump!" and "1776!" all with an alarm blaring in the background (Gov't Ex. 304), *see also Griffith*, 2023 U.S. Dist. LEXIS 84966 at *4 (describing "earsplitting

alarm" inside Senate Wing Door at approximately 2:50 p.m.).  A rational juror could find based on all this evidence that the defendants, in joining this mob (where Mr. Chwiesiuk acknowledged "shit was nutzzzzzzz" and people had taken all the flags), "disturb[ed] the public peace[,]" "undermin[ed] public safety[,]" or "interrupt[ed] an event[.]"  ECF No. 103, p. 9.

**2.     The Argument that the Riot Did Not Impede or Disrupt Government Business or Official Functions Fails**

Defendants advance the questionable argument that because the Joint Session was stopped at around 2:20 p.m. and the Chwiesiuks entered at approximately 2:57 p.m., there is no evidence that the Chwiesiuks' unlawful entry "occurred when, or so that, their conduct in fact impeded or disrupted the orderly conduct of government business or official functions."  18 U.S.C. § 1752(a)(2).  As seen in Gov't Ex. 001, the first breach of the rioters onto restricted grounds happened at approximately 12:57 p.m., and the chaos continued well past 4:30 p.m. when the video shows police officers continuing to remove rioters from restricted Capitol grounds.

Nonetheless, the defendants argued in their motion that they did not in fact disrupt Congressional proceedings when they unlawfully entered the Capitol because, at that time, both Houses of Congress had recessed and the Vice President was in a secure location.  "This argument fails."  *United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. June 17, 2022) (Kollar-Kotelly, J.).  As the *Rivera* Court explained, "[d]efendant's argument would have the Court add an additional requirement to the statute's causation clause, mandating that a defendant be the *but for* cause of a disruption.  There is no such term, and the Court does not read terms into statutory provisions that are not there."  *Rivera*, 607 F. Supp. 3d at 9.  The *Rivera* court continued:

> The following metaphor is helpful in expressing that the statute *does* require.  Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.  Only when all of the floodwaters subside is order restored to the field.  The same idea applies in these circumstances.  Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the

continued interruption to Congressional proceedings, the Court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions.

*Id.*

In this case, Cpt. Baboulis testified that at no point were the rioters ever given permission to enter or remain inside of the Capitol.  Trial Tr. (Aug. 8, 2023), p. 93.  Capt. Baboulis also testified that rioters the Joint Session of Congress had to be stopped not only because of the presence of rioters in the building, but also because many of them were carrying objects (including flags) or wearing clothing (helmets, tactical gear, etc.) that is not allowed in the Capitol at any time.  *Id*. at 81-83.  She noted that none of these individuals had gone through any kind of security screening before entering the Capitol.  *Id.* at 82.  Similarly, Special Agent Glavey testified that, for the U.S. Secret Service to perform its security function, it is important to know that *no unauthorized individuals* would be in the Capitol.  Trial Tr. (Aug. 9, 2023), pp. 8-9.  In addition, SA Glavey would not have been comfortable allowing the Vice President to leave the secure location while there were protestors in the building because, without screening, she would not know whether any of the protestors had a weapon or explosive device.  *Id.* at 21-22.  SA Glavey testified that at approximately 8:00 p.m. on January 6, 2021, the Vice President left the secure location to resume the certification proceedings.  *Id*. at 20-21.  Thus, there is sufficient evidence from which a reasonable jury could infer that Congress intended to resume but could not until all the rioters had been cleared from the building.

The Chwiesiuks entered the Capitol at approximately 2:58 pm, after the Joint Session of Congress had been suspended.  As Judge Berman Jackson explained, "[I]t doesn't matter to this Court if he entered the building after the official proceeding had been suspended and the Vice President had already been evacuated to another safe place within the building."  *United States v.*

*[2] Edward Badalian*, 21-CR-246-2 (ABJ), ECF No. 175 (Transcript of Verdict, Apr. 4, 2023), p. 38.  In *Badalian*, as in this case, there is no "evidence in the record" that the defendants were aware that the proceedings had been suspended when they entered the building.  *Id*.  Also, like *Badalian*, there is evidence from which a reasonable jury could (and in this case, did) find that the defendants were aware that official proceedings were taking place that day.  *Id*.  Judge Cooper rejected a similar argument, one "that hinges on the mistaken belief that only the first and last protestor into the Capitol were disruptive to the proceeding."  *United States v. Barnett,* 21-CR-38 (CRC), ECF No. 203 (Memorandum Opinion and Order), p. 15.

When all the evidence is viewed rationally, dispassionately, and in the light most favorable to the government while also being highly deferential to this jury's verdict, this jury had ample reason to conclude that the Chwiesiuks obstructed the proceeding to certify the electoral count and to convict them on Count Two.

### c.  *Count Four—Disorderly Conduct in a Capitol Building*

Count Four charges a violation of 40 U.S.C. § 5104(e)(2)(D), which prohibits any individual or group of individuals from willfully and knowingly,

> Utter[ing] loud, threatening, or abusive language, or engag[ing] in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

At trial, the government presented sufficient evidence for a reasonable jury to conclude (1) that the defendants engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; (2) that they did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) that the defendants acted willfully and knowingly.  40 U.S.C. § 5104(e)(2)(D); ECF No. 103, p. 10-11.

Here, the government relies on the facts as recounted above that the Chwiesiuks engaged in disorderly or disruptive conduct while inside the Capitol.  The government presented sufficient evidence for a reasonable jury to conclude that they went to Washington, D.C., specifically for the Stop the Steal rally, and that they went to the U.S. Capitol after listening to the former president's entire speech.  Trial Tr. (Aug. 10, 2023), pp. 15-17.  They bought a flag bearing the former president's name as they walked down Pennsylvania Ave towards the Capitol.  *Id*. at 26-27.  Once they got to the Capitol, they saw a crowd, but they were determined to get inside the Capitol, so they went on the lawn on the north side and around to the Capitol's Upper Terrace.  *Id*. at 90-92. There, from the moment they stepped onto the Upper Terrace of the Capitol, they saw signs of chaos, disorder, damage, violence acts, and violent rhetoric.  *Id*. at 94-100.  Mr. Chwiesiuk volunteered on direct examination that he and Ms. Chwiesiuk were able to enter the United States Capitol—a building that Mr. Chwiesiuk as a Political Science major surely recognized as the seat of the Legislative Branch of the government of the United States of America—without encountering any guards, signs, magnetometers, or x-ray machines, but was full of people chanting, people that were "tremendously loud" in a "tremendously crowded" area.  *Id*. at 30-32. Instead of turning back, they pressed forward, determined to get inside.

| | |
|---|---|
| **AUSA Murphy:** | Now, again, just to be clear, no one was forcing you to go to the Capitol; right? |
| **Mr. Chwiesiuk:** | No. |
| **AUSA Murphy:** | After the rally, you could have gone anywhere in Washington, D.C.? |
| **Mr. Chwiesiuk:** | No. We were to go to the Capitol. |
| **AUSA Murphy:** | To be clear, my question, you could have gone anywhere in Washington, D.C.; right? |
| **Mr. Chwiesiuk:** | Correct. |

> **AUSA Murphy:**    But you chose to go to the Capitol?
>
> **Mr. Chwiesiuk:**    Yes.

*Id.* at 93.  Mr. Chwiesiuk, under oath, also gave statements during his direct examination that were shown to be false and self-serving misrepresentations during cross-examination.  This includes when he claimed that they got to the Capitol on a sidewalk (*Id.* at 28) versus when on cross he admitted that he and Ms. Chwiesiuk went on the North Lawn of the Capitol to try and get around the crowd (*Id.* at 90); when he claimed that he was always in a crowd and that the flow of the crowd was into the Capitol (*Id.* at 28) versus when he recognized on cross that there was no one behind him at several points (*Id.* at 92) as he made his way to the Capitol and that there were people moving freely in both directions (*Id.* at 99); and when he claimed on direct that they were in a large crowd, "almost something similar to a concert" (*Id.* at 29) versus when he recognized on cross that there were several moments, including when he entered the Capitol, when he had plenty of space and no one was pushing either him or Ms. Chwiesiuk forward into the Capitol (*Id.* at 100).

Mr. and Ms. Chwiesiuk once again pressed the claim that they left the Capitol "[w]hen law enforcement informed the Defendants that they could not be in the building[.]"  ECF 117, p. 11. Mr. Chwiesiuk himself chose to testify and present the jury with this story.  The jury had a full opportunity to hear Mr. Chwiesiuk's testimony, hear his attorney's arguments regarding that testimony, and deliberate regarding that testimony.  By convicting the defendants, they necessarily either discredited this testimony altogether, or concluded that any such conversation with the police was not, as the defendants argued, the first indication they had that they were acting unlawfully in entering Capitol grounds and the besieged building itself.  There was ample evidence for any reasonable jury to convict the Chwiesiuks of Count Four, and a reasonable jury did convict the Chwiesiuks of Count Four.

### d.   *Count Five—Parading, Demonstrating, or Picketing in a Capitol Building*

Count Five charges a violation of 40 U.S.C. § 5104(e)(2)(G), which prohibits any individual or group of individuals from willfully and knowingly, "parad[ing], demonstrat[ing], or picket[ing] in any of the Capitol Buildings."

At trial, the government presented sufficient evidence for a reasonable jury to conclude (1) that the defendants paraded, demonstrated, or picketed in any of the Capitol Buildings; and (2) that the defendants acted willfully and knowingly.  40 U.S.C. § 5104(e)(2)(G); ECF No. 103, p. 11.  Regarding the evidence that the Chwiesiuks acted willfully and knowingly, the government relies on the evidence discussed above and the evidence introduced at trial.  The Court must view all this evidence in the light most favorable to the government, with all due deference to the jury's verdict.

There is ample evidence that the defendants paraded, demonstrated, and picketed, using the ordinary definitions of parading and picketing. They walked from President's Park down Pennsylvania Ave to the Capitol, stopping to purchase a flag which Mr. Chwiesiuk then carried with him for the majority of his time on restricted grounds and within the U.S. Capitol. At times they walked with people in crowds.  In his direct examination, Mr. Chwiesiuk described how they moved with people in a flow onto the Capitol grounds and then continuing towards the Capitol. Trial Tr. (Aug. 10, 2023), pp. 30-31.  He admitted that he moved with others into the Capitol.  *Id*. at 31.  The defendant's own admissions as corroborated by the government's evidence in the form of surveillance video and publicly available video are more than sufficient for a reasonable jury to be able to conclude that the behavior of Mr. Chwiesiuk and Ms. Chwiesiuk fits the ordinary meaning of parading and picketing.

Their behavior also fits the definition that was provided for the term "demonstrate."

> The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activities such as quiet praying.

ECF No. 103, p. 11.

The government presented sufficient evidence from which a reasonable and rational jury could and did find that Mr. Chwiesiuk and Ms. Chwiesiuk, on during their time on restricted grounds and inside of the Capitol "obstruct[ed] passageways" and impeded "hearings, or meetings." Mr. Chwiesiuk had a flag bearing the former president's name that he had bought while walking with a crowd from the former president's speech. Ms. Chwiesiuk had a face mask with an upside-down American flag. They stopped in the broken-out doorway they used to enter the Capitol, an emergency exit only fire door, to take videos and selfie-style photographs. Mr. Chwiesiuk stopped to enter and take a picture inside of the hideaway office of a U.S. Senator, a room that he implausibly testified that he believed was a "smoking room." Trial Tr. (Aug. 10, 2023), p. 118. Based on the Chwiesiuks' behavior as seen through the evidence presented at trial, there is no reason for this Court to now disturb the jury's verdict of guilty.

By advancing this argument regarding the sufficiency of the evidence for parading and picketing, the defendants are attempting to have their cake and eat it too. During jury deliberations, the jury came back with the specific question, "Definitions for parading and picketing?" Trial Tr. (Aug. 11, 2023), p. 2. After the government and defense counsel conferred and submitted their proposed definitions to the Court, the Court went with "the defendants' proposal that the terms parade and picket have their ordinary meanings." *Id*. at 3. In an email to the Court, with defense counsel CC'd, the government suggested the following as the definition for parading and demonstrating and in response to the jury note:

> [T]o parade means to take part in a march or procession, organized on a grand scale, in support of some political object. Similarly, to demonstrate means to take part in a public manifestation, by a number of persons, of interest in some public question,

> or sympathy with some political or other cause; usually taking the form of a
> procession and mass-meeting.

*United States v. Rivera*, 607 F. Supp. 3d 1, 10 (D.D.C. 2022) (internal quotation marks and citations omitted).  Defense objected to this, or any other definition of the terms—but now the defendants come before the Court suggesting that the Court apply dicta from *Martin* as the definition.

The defendants asked that the Court instruct the jury that the terms parading and picketing have their common meanings, and the Court did so.  Based on this response and instruction, the jury convicted the defendants of Count Five.  The conviction should remain undisturbed.  There was ample evidence for any reasonable jury to convict the Chwiesiuks of Count Five.

## IV.    CONCLUSION

For the foregoing reasons, the Chwiesiuks' Motion for a Judgment of Acquittal should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

DATED: October 27, 2023          By:

Sean P. Murphy
Assistant U.S. Attorney
New York Bar Reg. No. 5321617
On Detail from the District of Puerto Rico
Torre Chardon, Ste. 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov

_____/s/_____

Anna Z. Krasinski
Assistant U.S. Attorney
On Detail from the District of New Hampshire