**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-536 (ACR)** |
| **v.** | : | |
| | : | |
| **[1] KAROL J. CHWIESIUK,** | : | |
| **[2] AGNIESZKA CHWIESIUK,** | : | |
| | : | |
| **Defendants** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence defendant [1] Karol J. Chwiesiuk to a 12-month term of incarceration and defendant [2] Agnieszka Chwiesiuk to an 8-month term of incarceration, respectively.  The government further requests that this Court sentence both defendants to a one-year term of supervised release to follow their periods of incarceration, 60 hours each of community service, and $500 in restitution.

## I.      Introduction

Defendant Karol J. Chwiesiuk, a 31-year-old[1] part-time unarmed security officer, and Agnieszka Chwiesiuk, a 30-year-old National Account Manager at OTR Transportation, Inc., together participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress' certification of the 2020 Electoral College vote count,

---

[1] Karol Chwiesiuk, who will be 32 years-old by the time he is sentenced, was an off-duty police officer for the City of Chicago Police Department when he participated in the events of January 6, 2021.

threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

A jury convicted the Chwiesiuks of four criminal violations—18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). The Court should also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the official proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of the Chwiesiuks' crimes support the government's recommendation that this Court impose a 12-month and 8-month term of incarceration on Karol Chwiesiuk and Agnieszka Chwiesiuk respectively.

The government's recommendation is supported because Karol and Agnieszka Chwiesiuk both (1) entered the Capitol at the Senate Wing Door, the initial breach point on January 6, and they did so notwithstanding the signs of the violent breach, including broken windows and a blaring, audible, alarm; and (2) neither has accepted responsibility nor expressed remorse for their conduct on January 6. Additionally, Karol Chwiesiuk chose to disregard the training he received and the oath he took as a police officer and public servant of the City of Chicago when he broke the law and stormed the Capitol on January 6, 2021, and then took the stand, swore to tell the truth, and lied to the jury when he told them that he thought it was fine to go inside the Capitol.

---

[2] As of July 7, 2023, the approximate losses suffered because of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses because of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 1-1, pp. 1-2; Karol Chwiesiuk Presentence Investigation Report, ECF No. 126 ("K.C. PSR"), ¶¶ 12-18; Agnieszka Chwiesiuk Presentence Investigation Report, ECF No. 128 ("A.C. PSR"), ¶¶ 9-15.

*Defendants Karol J. and Agnieszka Chwiesiuk's Respective Roles*
*in the January 6, 2021, Attack on the Capitol*

On Tuesday, November 3, 2020, the day of the Presidential Election, Karol Chwiesiuk texted his sister and co-defendant, Agnieszka Chwiesiuk, a message that stated, "Very confident maga 2020 my sister."  Gov't Ex. 402.  Four days later, on Saturday, November 7, 2020, all major news networks called the election for Joe Biden.  On Sunday, January 3, 2021, Karol Chwiesiuk texted his cousin, Dr. M., stating that he was going to Washington, D.C., "To save the nation," also adding, "Im fuck up some commies."  Gov't Ex. 700.  When Karol Chwiesiuk's cousin confronted him with evidence about the false nature of the former president's election fraud claims, Chwiesiuk responded, "Didn't read.  Busy planning how to fuck up commies."  Gov't Ex. 701.  Two days later, on January 6, Karol Chwiesiuk followed-up on these "plans" with Dr. M., claiming, "Knocked out a commie last night.  Don't tell Agnes."

Agnieszka Chwiesiuk also participated in planning their trip to Washington, D.C., searching the internet for hotels and researching whether the city's mayor had instituted any rules in advance of January 6, disallowing "ppl to stay from out of state or some bs."  Gov't Ex. 402-03 – 402-14.

The Chwiesiuks rented a car and drove from their family home in Chicago, IL, to Washington, D.C.  At the time, Karol Chwiesiuk was a police officer for the Chicago Police

Department but was on medical leave due to issues with his back.  The Chwiesiuks arrived in the morning of January 5, 2021.  On that same day, January 5, Agnieszka Chwiesiuk sent Karol Chwiesiuk two screenshots.  Gov't Ex. 402-016, 402-017.  The first screenshot asked, "How many other patriots are headed to DC to build FORT TRUMP? 👊".  The second screenshot identified the times and locations of certain events taking place on January 5-6, 2021.  This included a rally at the White House where the location is clearly listed as The Ellipse – President's Park and start time is listed as, "Doors open at 7:00 AM (EST)".  It also included a Protest at the US Capitol where the location is clearly identified as the "US Capitol Building, South lawn, between Capitol and SCOTUS" with an identified start time of 1:00 PM (EST).



**IMAGE 1:** *An image recovered from Karol Chwiesiuk's phone that was saved to his phone on January 4, 2021, and which lists the locations of the planned protests.*

Karol Chwiesiuk received an email on January 5, 2021, with the subject line, "Tomorrow is going to be a historic day in Washington DC," and another email the next day, January 6, 2021, with the subject line, "Today is going to be a historic day in Washington DC."  Both emails encouraged the recipient, "Please pay close attention to the following event details."  Both emails

then listed and described the time and location for the former president's speech at the Ellipse and then for a protest "outside of the US Capitol building."  Gov't Ex. 604.

In the evening hours of January 5, 2021, Agnieszka Chwiesiuk appears to have stayed at the hotel while her brother walked around the Capitol's restricted perimeter.  He took several photographs of himself at the Capitol and of the Capitol itself.  Many of these photographs show the bike rack fencing, the snow fencing, and the AREA CLOSED signs that were described by Captain Baboulis at trial.

 

**IMAGES 2, 3:** *Two photographs recovered from Karol Chwiesiuk's phone that were taken by Karol Chwiesiuk outside the perimeter of the restricted grounds in the evening of January 5, 2021. Bike rack barriers, snow fence barriers, and the AREA CLOSED signs are clearly visible in the photographs.*

As seen in the image below, Karol Chwiesiuk (represented by the blue and yellow dots), went to the U.S. Capitol the night before the attack and walked around the west and south sides of

the restricted perimeter of the Capitol's grounds. He sent several pictures showing the rigid bike rack barrier and the more flexible snow fencing barrier to his sister, both of which clearly depicted the presence of restrictive fencing and the signs that clearly stated AREA CLOSED.



**IMAGE 4:** *A map showing where Karol Chwiesiuk's phone pinged on Pennsylvania Ave and outside the restricted grounds of the Capitol in the evening of January 5, 2021.*

These details are important because they show that the Chwiesiuks knew how to plan, knew how to look up information, and knew where the planned events were taking place. More specifically, they knew that nothing and no one authorized them to enter the Capitol. Nothing indicated that the Capitol was or would be open to the public, and nothing they received indicated that it would be lawful or permissible to enter the Capitol, especially not as part of a violent mob.

On January 6, 2021, the Chwiesiuks attended a rally by the Ellipse to support the former President. They underwent extensive security screening measures to be in attendance, even in those areas that just had a projection screen and were far from where the actual former president was speaking. They listened to the former president talk about leading them to the Capitol, and they decided to go.

 

*IMAGES 5, 6: (left) A photo of* **Agnieszka** *Chwiesiuk at the "Stop the Steal Rally" with the former President visible on the screen behind her (Gov't Ex. 410); and (right) a photo of Karol Chwiesiuk with the Washington Monument in the background taken prior to storming the Capitol (Gov't Ex. 403-033).*

After the rally, the Chwiesiuks marched down Pennsylvania Avenue to the Capitol. Karol Chwiesiuk texted friends and colleagues from the Chicago Police Department, stating, "We have to kurwa [fucking] save America," "He's leading us to the fucking capital," and then later on, "Goin in," and "We are kurwa [fucking] inside."

Once they arrived at the restricted grounds, the Chwiesiuks saw that the direct route to the Capitol was heavily congested by other rioters that arrived at the Capitol before them. As he testified in trial, the Chwiesiuks wanted to get to the Capitol, and accordingly, they found another way forward. The Chwiesiuks circumvented the crowd by running across the restricted grounds of the Capitol's North Lawn, after which they hopped up and over a small wall and returned to the West Front of the Capitol via the Capitol's North and Northwest Terrace.

 

 

***IMAGES 7, 7a, 8, and 8a:*** *Screenshots from Gov't Ex. 201 showing (top right) Karol Chwiesiuk walking past the downed bike rack and snow fencing barricades and hopping up and over a small wall with (top right) a close crop of the same activity; (bottom left) Agnes Chwiesiuk walking past those same barricades and extending her had so that her brother could help her up and over the same wall and (bottom right) a close crop of the same activity.*

Once in the NW Courtyard, the Chwiesiuks witnessed numerous instances and acts of chaos, violence, and destruction.  They saw an individual getting their eyes washed out following exposure to a chemical irritant.

  

*IMAGES 9, 10, 10a: (left) Screenshot from Gov't Ex. 424, recorded by Karol Chwiesiuk, at 00:09 showing Agnieszka Chwiesiuk (circled in red) on the North Terrace using her cellphone to record the events around her; (middle) a screenshot from Gov't Ex. 424 at 00:18 showing a rioter having his eyes rinsed out in front of where the Chwiesiuk were standing; and (right) a close crop of the rioter having his eyes rinsed out.*

The Chwiesiuks saw individuals dressed in tactical gear and they saw rioters stealing a piece of heavy-duty machinery, or at a minimum, using it without authorization.  Karol Chwiesiuk texted an image of the unidentified individuals on the lift with the message, "They stole a lift." Gov't Ex. 401-010, 401-012.  The Chwiesiuks also saw that the windows of the Capitol had been broken out, they heard the alarms blaring, and they witnessed rioters streaming into and out of fire egress doors that had no markings or indicia of a typical entry point for a highly secured government building (i.e., magnetometers, security personnel, x-ray machines, etc.).

 

***IMAGES 11, 12:*** *(left) A photograph sent by Karol Chwiesiuk to David Z. (Gov't Ex. 401-012) with the accompanying message, "They stole a lift"; and (right) another photograph (Gov't Ex. 401-013) sent by Karol Chwiesiuk to David Z. showing rioters streaming into and out of the fire egress known as the Senate Parliamentarian's Door.*

While on the Upper Terrace of the Capitol, the Chwiesiuks joined a large, loud crowd in the NW Courtyard.







***IMAGES 13, 13a, 14, and 14a:*** *(top) A screenshot and crop thereof from Gov't Ex. 301a at 00:04 showing the Chwiesiuks in the crowd entering the NW Courtyard, and (bottom) a screenshot and crop thereof from Gov't Ex. 302 at 00:06 showing the Chwiesiuks approaching the Senate Wing Door.*

Undeterred by the sound of the blaring alarm, the broken windows and doors, the sight of rioters suffering the effects of chemical irritants, and the fact that they had to work their way against a steady flow of rioters coming out of the Capitol, the Chwiesiuks pushed forward.  At approximately 2:57 p.m., the Chwiesiuks entered the Capitol through a broken-out fire door, a location commonly referred to as the Senate Wing Door.



**IMAGE 15:** *A screenshot from Gov't Ex. 203c showing Karol Chwiesiuk (red) and Agnieszka Chwiesiuk (yellow) after entering the Capitol on January 6, 2021.*

Karol Chwiesiuk recorded a selfie video of himself just after entering the Capitol.  An alarm was blaring, and rioters were chanting, "Fight for Trump!"  Gov't Ex. 426.  The Chwiesiuks made their way through the crowd and walked south towards the Capitol Crypt.  On the way, Karol Chwiesiuk entered a hideaway office that was at the time assigned to Oregon Senator Jeff Merkley. The Chwiesiuks then continued south, walked into the Capitol Crypt, and took more photographs.

 

 

*IMAGES 16, 17, 18, 19: (top) Two selfie photographs recovered from Karol Chwiesiuk's phone showing (top left) the Chwiesiuks just inside the Senate Wing Door and (top right) Karol Chwiesiuk inside of the hideaway office of Oregon Senator Jeff Merkley; and (bottom) two photographs of Agnieszka Chwiesiuk posing while standing in the Capitol Crypt.*

The Chwiesiuks exited the Capitol, leaving the same way they came in.  In leaving the Capitol, however, they climbed out of a broken-out window to the south of the Senate Wing Door at approximately 3:08:16 p.m.  In total, the Chwiesiuks spent approximately nine minutes inside the Capitol Building.



**IMAGE 20:** *A screenshot from USCP CCV showing the Chwiesiuks leaving the Capitol by climbing through a broken-out window of the Capitol.*

*Lack of Remorse*

Following the events of January 6, 2021, neither of the Chwiesiuks expressed any remorse for their part in the riot.  To the contrary, later that evening, Karol Chwiesiuk texted an individual named Brandon B., describing the experience thusly, "It was epic.  Super fun.  The optics are bad but fuck it at this point ya know."  Gov't Ex. 404.  That same evening, he texted another individual and claimed, "I was trying to [steal] a fuckibg flag.  But they took em all."  Gov't Ex. 401-017. After David Z. replied, "Damnit lol.  That would be sick," Karol Chwiesiuk responded, "I know."

Similarly, just before 1 a.m. on January 7, 2021, Agnieszka Chwiesiuk sent her brother a meme, comparing the storming of the Capitol to the Boston Tea Party and describing January 6 as "the most American thing I've seen in my lifetime."  Gov't Ex. 402-30, 402-31.



**IMAGE 21:** *The meme that Agnieszka Chwiesiuk texted to Karol Chwiesiuk in the early morning hours of January 7, 2021, contained the text, "I'm tired of hearing people say 'this is not American. This isn't who we are'.  It's the most American thing I've seen in my lifetime."*

Later, while exchanging messages with his cousin on January 13, 2021, Karol Chwiesiuk texted, "Don't snitch."  Gov't Ex. 708.  He also wrote, "As to [the Department of Justice] knowing who was there idc lmao."  He concluded that particular exchange by stating, "I maintain that Donald J. Trump is the legitimate president of the United States.  Enjoy communism for 4 years." Gov't Ex. 419.

### Destruction of Photographs, Videos, and Other Evidence

On June 11, 2021, the FBI arrested Karol Chwiesiuk for his actions during the Capitol riot and seized his cellphone pursuant to a warrant.  His cellphone appeared to have been deliberately

damaged, did not turn on and required additional efforts for the FBI to extract the data.  Agnieszka Chwiesiuk was at their shared home when the FBI arrested Karol Chwiesiuk.  Though she had had the same cellphone and cellphone number since November 2018, she purchased a new device five days after her brother's arrest.  She changed the type of device (Android/iOS) and did not transfer any data, including the images she recorded on January 6, 2021, to her new device.  *See* Gov't Ex. 502; A.C. PSR ¶ 24.

On January 21, 2023—two days after her arrest and more than two years after the events of January 6—Agnieszka Chwiesiuk created a crowdsourcing campaign webpage on GiveSendGo.com.  She explained that she "was arrested and charged as part of the January 6th witch hunt" and falsely claimed that she was merely "exercising [her] constitutional rights."  She went on to claim that the "prosecution is politically motivated" with the goal of ruining her "finances, reputation and future prosperity."  Exhibit 1.

### *Misstatements and Untruths by Karol J. Chwiesiuk at Trial*

During trial, Karol Chwiesiuk chose to take the stand and testify in his own defense.  He had a Constitutional right not to do so, was advised of this right, and chose to take the witness stand.  Before being allowed to testify in his own defense, Karol Chwiesiuk was required to swear that he would tell the truth.  He swore to tell the truth.  He did not tell the truth.

Nearly every aspect of Karol Chwiesiuk's testimony was self-serving and a misrepresentation of the facts to the jury.  During his time on the stand, Karol Chwiesiuk testified that he did not have any idea what was happening at the Capitol that day, despite receiving emails talking about rallies supporting the former president, as well as information about a protest outside of the Capitol building.  *See*, Image 4; Gov't Ex. 604.  He claimed that despite being a corrections officer and police officer, he saw no signs that anything was wrong at the Capitol, even as fencing was torn down, windows were broken, people were climbing into and out of broken windows, and

violent chants were ringing through the halls of Congress.  He testified that even though he went and took pictures of the restricted Capitol grounds and AREA CLOSED signs the night before, he had no idea that entering the restricted grounds and entering the Capitol the next day would be wrong.  He testified that he believed that the hideaway office of a United States Senator was a smoking room because other rioters were smoking inside.  Nearly every aspect of Karol Chwiesiuk's testimony was self-serving and a misrepresentation of the facts to the jury.  Through its verdict of guilt, the jury rejected Karol Chwiesiuk's claims.

*The Charges and the Verdict*

On February 14, 2023, Karol Chwiesiuk and Agnieszka Chwiesiuk were charged in a Superseding Information with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly or Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct on Capitol Grounds or in any of the Capitol Buildings), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in any of the Capitol Buildings).[3]  All four crimes are misdemeanors. Following a jury trial in August of 2023, a jury convicted the Chwiesiuks on the above counts.

### III.    Statutory Penalties

The Chwiesiuks now face sentencing after their respective convictions for violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  As noted by the U.S. Probation Office, the Chwiesiuks face up to one year of imprisonment and a fine of up to $100,000 on Counts One and Two, and up to six months of imprisonment and a fine of up to $5,000 on

---

[3] Karol Chwiesiuk was charged with one additional count charging him with entering or remaining in a room designated for the use of a member of Congress in violation of 40 U.S.C. § 5104(e)(2)(C)(i).  The jury acquitted him on this charge.

Counts Four and Five.  The Court may also order the Chwiesiuks to pay restitution, but it is not mandatory.  *See* 18 U.S.C. § 3663(a)(1)(A).

### IV.     The Sentencing Guidelines and Guidelines Analysis

Because the two § 1752 offenses are Class A Misdemeanors, the Sentencing Guidelines apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.  The Sentencing Guidelines do not apply to the § 5104 offenses, however, because they are both Class B Misdemeanors.  *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees that the Base Offense Level is 10 for both Karol and Agnieszka Chwiesiuk.  *See* K.C. PSR at ¶ 44, A.C. PSR at ¶ 41.  The government objects to the PSR's failure to include an enhancement for Obstructing or Impeding the Administration of Justice under 3C1.1 his misleading testimony at trial.  In addition, the government objects to the two-level reduction under 4C1.1 in this case.  *See* K.C. PSR at ¶ 51, A.C. PSR at ¶ 48.

*Objection to the Omission of an Enhancement under Guideline 3C1.1 for Karol Chwiesiuk*

Guideline 3C1.1 provides for a two-level enhancement where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" with respect to the prosecution of the defendant's offense of conviction.  This enhancement includes

false testimony at trial, so long as such testimony is material, U.S.S.G. § 3C1.1 cmt. 4(B); but it is not intended to punish the defendant for the exercise of a constitutional right or his denial of guilt. *Id.* cmt. 2.  In another case related to crimes committed on January 6, the D.C. Circuit recently affirmed the district court's application of this enhancement where a defendant provided "misleading testimony at trial," even though the defendant's testimony fell "short of deliberate falsehoods." *United States v. Alford*, No. 23-3023, 2024 WL 57356 at *7 (D.C. Cir. Jan. 5, 2024). In *Alford*, the defendant testified that he traveled to D.C. to "enjoy [himself], take some pictures, enjoy some like-minded people." *Id.* at 7 n. 5.  The defendant "also claimed not to notice the signs and barricades restricting access to the Capitol and claimed not to know that he was not allowed inside." *Id.*  In addition, the defendant testified that, "once in the Capitol, he was just 'being a sightseer in D.C.'" *Id.*  The enhancement applied because the defendant's testimony was "disingenuous and not entirely candid or truthful." *Alford*, 2024 WL 57356 at *7.

Karol Chwiesiuk's testimony mirrors the defendant's misleading testimony in *Alford*.  He testified that he did not see the AREA CLOSED signs when he went to the Capitol the evening of January 5, 2021, despite taking a selfie near them.  Aug. 10, 2023, Tr. Tran. 21:17-24; *see also*, Image 2.  He also claimed not to notice signs and barricades restricting access to the Capitol and claimed that he "did not have an impression that the area was closed off." *Id.*, at 20:21-21:14, 31:1-31:7.  He claimed that he believed it was "okay for [him] to be [inside the Capitol]," *id.*, at 38:19-21, despite seeing broken windows and people smoking inside the Capitol, despite the audible, blaring alarm, and despite his description of the scene inside the Capitol as "[t]remendously loud" and "tremendously crowded," *id.*, at 32:7-10.  He testified that he believed that the hideaway office of a United States Senator was a smoking room because other rioters were smoking inside, yet even he called the idea that it was a smoke room "unbelievable." *Id.*, at 34:4-

34:14.  Like the defendant in *Alford*, Karol Chwiesiuk's testimony was "disingenuous and not entirely candid or truthful."  A two-level enhancement under 3C1.1 should apply.

*Objection to the Application of Guideline 4C1.1*

The U.S. Probation Office calculated Karol and Agnieszka Chwiesiuks' respective criminal history categories as I.  K.C. PSR at ¶ 55, A.C. PSR at ¶ 52.  Because neither of the Chwiesiuks have any criminal history points, the U.S. Probation Office reduced their offense levels by two points.  Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.  The government objects to the two-level reduction under guideline 4C1.1 in this case.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

The Court should not apply § 4C1.1 here for the [further] reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers.  Every rioter, whether they personally engaged in violence or personally threatened violence or not, contributed to this harm.  *See, e.g., United States v. Rivera*, 21-CR-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.  Only when all of the floodwaters subside is order restored to the field.  The same idea applies in these circumstances.  Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the

defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010.  *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.  Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6.  This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level.  Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The

*Guideline Calculations*

Should the Court apply a two-level enhancement under 3C1.1 for Karol Chwiesiuk and decline to apply § 4C1.1 for Karol and Agnieszka Chwiesiuks, their respective guideline sentencing ranges would be as follows:

Karol Chwiesiuk:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4) | 10 |
| Obstruction (U.S.S.G. 3C1.1) | +2 |
| Total Adjusted Offense Level | 12 |

With a criminal history category of I, Karol Chwiesiuk's sentencing guideline range should be 10-16 months' imprisonment.[5]

Agnieszka Chwiesiuk:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4) | 10 |
| Total Adjusted Offense Level | 10 |

With a criminal history category of I, Agnieszka Chwiesiuk's sentencing guideline range should be 6-12 months' imprisonment.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

---

government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[5] The statutory maximum on Counts One and Two is 12 months of imprisonment and thus the Court is capped at 12 months on those counts. The Court could impose the sentences on those counts to run consecutively to reach a term of imprisonment of 16 months.

### V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In the case of Karol Chwiesiuk, the Section 3553(a) factors weigh in favor of a 12-month term of incarceration followed by one year of supervised release.  In the case of Agnieszka Chwiesiuk, the Section 3553(a) factors weigh in favor of an 8-month term of incarceration followed by one year of supervised release.

#### The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing the Chwiesiuks' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for misdemeanor defendants like the Chwiesiuks, the absence of violent or destructive acts is not a mitigating factor.  Had the Chwiesiuks engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in Agnieszka and Karol Chwiesiuks' case is their decision to enter the Capitol after having witnessed the damage and violence occurring outside the Capitol building.  Both ignored the rioters flushing their eyes out after exposure to a chemical irritant, the broken windows, and the blaring alarm.  And, as discussed more below, neither expressed remorse and both continued to endorse their conduct more than two years after the riot. Initially, Agnieszka Chwiesiuk described breaching the Capitol as "the most American thing" she has seen in her lifetime.  And just after her arrest, she falsely claimed that she was this was a politically motivated prosecution.  Karol Chwiesiuk's conduct, including repeatedly testifying

falsely at trial, is more egregious, and the government is thus recommending a higher sentence for him. Accordingly, the nature and the circumstances of this offense coupled with their lack of remorse about the offense establish the clear need for a sentence of incarceration in this matter.

*The Chwiesiuks' History and Characteristics*

As set forth in the PSRs, Karol and Agnieszka Chwiesiuk have no criminal history. K.C. PSR at ¶ 55; A.C. PSR at ¶ 52. Both have been compliant with the conditions of pre-trial release. Both of the Chwiesiuks reported a good childhood, and both continue to live with their parents in Chicago, Illinois. K.C. PSR at ¶¶ 62-63; A.C. PSR at ¶¶ 59-60. The siblings report that they maintain a close relationship with each other. K.C. PSR at ¶¶ 62-63; A.C. PSR at ¶¶ 59-60. These stabilizing family factors did not deter either Chwiesiuk from committing the instant offenses. And their post-riot comments exhibit pride rather than remorse.

At the time he stormed the Capitol, Karol Chwiesiuk was a sworn Chicago Police Officer. K.C. PSR at ¶ 79. He had previously served as a Corrections Officer at the Cook County jail in Chicago, IL. K.C. PSR at ¶ 78. While his public service and service on the police force is commendable, it makes his already unbelievable claims that he imagined he could be inside the Capitol despite all the signs around him to the contrary even more implausible. Karol Chwiesiuk lost his job with the Chicago Police Department following his participation in the riot. K.C. PSR at ¶ 79. The possible consequences of Karol Chwiesiuk's actions were entirely foreseeable and should have impacted his decision before he chose to storm the Capitol. Moreover, this is an employment decision for the Chicago Police Department to determine and implement. While this Court may consider the fact that he lost his job along with all of Karol Chwiesiuk's other characteristics, this loss does not absolve his criminal liability and should not be seen as a free pass for his criminal behavior.

*The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law*

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building.  What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.")

*The Need for the Sentence to Afford Adequate Deterrence*

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### GENERAL DETERRENCE

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred."  (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  There is possibly no greater factor that this Court must consider.

**SPECIFIC DETERRENCE**

The need for the sentence to provide specific deterrence to these defendants also weighs heavily in favor of a term of incarceration.  Neither Chwiesiuk has accepted responsibility for their crimes, and their post-January 6 statements are troubling.  Less than a day after storming the Capitol, Agnieszka Chwiesiuk sent her brother a text with a meme likening the storming of the Capitol to the Boston Tea Party and describing January 6 as "the most American thing I've seen in my lifetime."  Following her arrest, Agnieszka Chwiesiuk claimed she "was arrested and charged as part of the January 6th witch hunt."  She falsely claimed that she was merely "exercising [her] constitutional rights."  She went on to claim that the "prosecution is politically motivated" with the goal of ruining her "finances, reputation and future prosperity."  Her continued endorsement of her criminal conduct demonstrates that a term of incarceration is necessary to deter her specifically.

Like his sister, Karol Chwiesiuk has accepted no responsibility for his crimes and has shown no remorse.  He initially directed his cousin not to "snitch," indicating that he knew what he did on January 6 was wrong or, at least, illegal.  Indeed, his repeated misleading and self-serving statements under oath make clear that Karol Chwiesiuk presents a risk of repeating his conduct in the future if he is faced with a political outcome he does not like or a political victory he does not support.  A substantial term of imprisonment is particularly important for Karol Chwiesiuk to specifically deter him from any such future crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

*The Need to Avoid Unwarranted Sentencing Disparities*

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6]  This Court must sentence the Chwiesiuks based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot and continued endorsement of their criminal conduct.

The Chwiesiuks were convicted of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104I(2)(D) and (G).  The offenses are a Class A and B misdemeanors.  18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula."  *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).  Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.  *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

is to follow the guidelines.") (statement of Judge McFadden).  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.  *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court has not yet sentenced a January 6 defendant convicted of a Class A misdemeanor or a defendant who has proceeded to trial.  *See*, *Alford*, 2024 WL 57356, at * 7 (noting that there are "material differences" between defendants who proceed to trial and those who accept responsibility and plead guilty).

In *United States v. Rivera*, 21-CR-60 (CKK), the defendant was convicted of violations of 18 U.S.C. § 1752(a)(1), (a)(2), and 40 U.S.C. § 5104(e)(2)(d), (e)(2)(G), following a bench trial. In that case, the defendant saw assaults on police and watched rioters breach the Parliamentarian Door before entering the Capitol through a broken window next to the Senate Wing Door.  The defendant spent approximately twenty minutes inside the Capitol.  Both during and after the riot, the defendant celebrated his participation in the riot in public posts on his social media accounts. The defendant was sentenced to 8 months' imprisonment followed by 12 months of supervised release.

In *United States v Russell Alford*, 21-CR-263 (TSC), the defendant was convicted of violations of 18 U.S.C. § 1752(a)(1), (a)(2), and 40 U.S.C. § 5104(e)(2)(d), (e)(2)(G), following a jury trial.  In that case, the defendant entered the Capitol through a door he knew someone else had broken open.  He remained inside the building for approximately thirteen minutes.  The defendant mostly stood to the side, observed, and recorded other rioters with his cellphone.  Like Karol Chwiesiuk, the defendant in *Alford* provided misleading testimony to the jury.  He was sentenced to 12 months of incarceration followed by 12 months of supervised release.

In *United States v. Stacy Wade Hager*, 21-CR-381 (TSC), Judge Chutkan found the defendant guilty of violations of 18 U.S.C. § 1752(a)(1), (a)(2), and 40 U.S.C. § 5104(e)(2)(d), (e)(2)(G), following a bench trial.  *Hager*, ECF No. 51, Trial Tr., p. 227:9-13; ECF No. 63, Judgment, p. 1.  In that case, Hager and a friend attended the "Stop the Steal" rally and marched to the Capitol.  Hager entered the Capitol and spent a period walking from the Upper West Terrace door to the Grand Rotunda before eventually leaving through the South Door of the Capitol by way of the Hall of Columns.  Like Karol Chwiesiuk, Hager later described the experience on social media as "epic."  Like Agnieszka Chwiesiuk, Hager boasted on social media that his participation in the storming of the Capitol was the most patriotic thing he's ever done.  Judge Chutkan sentenced Hager to two seven-month terms of imprisonment on Counts 1 and 2, and two three-month terms of imprisonment on Counts 3 and 4, all of which would run concurrently.  Judge Chutkan's comments at Hager's sentencing resonate with the facts of the Chwiesiuks' case and their claims about what they did on January 6, 2021.

> This was not a civil rights demonstration.  This was a violent mob.  And you may have had a different motive for being there, but you knew you were going into a building you were not supposed to be in.  This was not, oh, gee, let's follow the crowd and have a look at the rotunda.  There were people yelling things.  There were people being tear gassed outside.  You knew you weren't supposed to be in there.

> You mentioned that the police officers, you know, they should have said don't come in or there should have been police officers instructing people to leave. That boggles my mind, Mr. Hager. Because those police officers were fighting for their lives, many of them. And the rest of them, were trying to stay alive. And to the extent that you think they could have been doing crowd control when people were throwing fire extinguishers at them and beating them with hockey sticks and attacking them with flag poles. I have had officers sit here in the courtroom and tell me how they slipped in their own blood. The same officer who you said you had a -- the Metropolitan Police Department officer you had an encounter with. You heard him he did -- I don't know how many years in the Seventh District, the most dangerous district in the city for how many years. And he said he had been in any number of dangerous situations but he never thought he could die until January 6. And he retired. Our police force, our city police force lost a dedicated and valuable officer because of what he saw and confronted on January 6.
>
> So the notion that somehow the police are responsible for not telling you that you shouldn't have been in there is frankly, incredible to me. Because I have heard from enough officers about the post-traumatic stress that they have suffered, about the suicidal attempts they have made, about the injuries they have suffered and continue to suffer because they were trying to do their job that day. And I am not saying there weren't one or two officers who may have been, you know, encouraging or allowing or in some way supporting. But that was not what the majority of the police officers, both Capitol Police and Metropolitan Police who came to try and defend the Capitol were doing.

ECF. No. 67, Sent. Tr., pp. 66:13-67:25. Judge Chutkan also compared Hager's case to the Alford case and sentencing, calling them "very, very similar" and recognizing that a key difference was that Alford "took the stand under oath at trial and testified and in a way that [Judge Chutkan] believes was false." *Id.* at p. 68:11-22.

There are many other similarities between Hager and the Chwiesiuks, including the lack of any criminal history and the fact that they had previously lived good lives with loving families in supportive communities. As Judge Chutkan recognized, however, that did not excuse his conduct on January 6, 2021, and actions have consequences. Hager is currently serving his term of imprisonment with a projected release date of April 2024.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or

deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because the Chwiesiuks were convicted of violations of an offense under Title 18, the VWPA does apply to those counts.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

"proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for their individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require the Chwiesiuks to each pay $500 each in restitution for their convictions on Counts One, Two, Four, and Five. This amount fairly reflects their respective roles in the offense and the damages resulting from their conduct. Moreover, in cases where the parties have entered a guilty plea pursuant to an agreement with the government, five hundred dollars has been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of misdemeanors and was not directly and not personally involved in damaging property. Accordingly, a restitution order in the amount of $500 each would avoid any sentencing disparity.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Karol Chwiesiuk to a 12-month term of incarceration followed by 1 year of supervised release, 60 hours of community service, and $500 in restitution.  The government further recommends that this Court sentence Agnieszka Chwiesiuk to an 8-month term of incarceration, followed by 1 year of supervised release, 60 hours of community service, and $500 in restitution. Such sentences would serve to protect the community, promote respect for the law, and deter future crime by imposing restrictions on the Chwiesiuks' liberty because of their behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  /s/Anna Z. Krasinski
Anna Z. Krasinski
Assistant United States Attorney
N.H. Bar No. 276778
On Detail from the District of New Hampshire
202-809-2058
Anna.Krasinski@usdoj.gov

Sean P. Murphy
Assistant United States Attorney
New York Bar Reg. No. 5321617
On Detail from the District of Puerto Rico
787-766-5656
sean.murphy@usdoj.gov